**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
---------------------------------------------------------x
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

       Plaintiff,

v.

                                 **DEMAND FOR JURY TRIAL**

VITAL COMMUNITY CARE, P.C.,
AMANDA MAKKI A/K/A AMANDA BAZZI A/K/A AMALE BAZZI,
NAMIR D. ZUKKOOR, M.D.,
MARTIN BLODA, M.D.,
MARK J. BRENNAN, M.D.,
AFFILIATED DIAGNOSTIC OF OAKLAND, L.L.C.,
INSIGHT DIAGNOSTICS, L.L.C.,
WARREN J. RINGOLD, M.D.,
NESREEN BAZZI,
AHMAD MAKKI A/K/A MIKE MAKKI,
ADVANCED PAIN SPECIALISTS, P.L.L.C.,
RICARDO D. BORREGO, M.D.,
JASON A. BITKOWSKI, D.O.,
HALA MOUSSA A/K/A HALA MAKKI, and
GET WELL MEDICAL TRANSPORT CO.,


       Defendants.
---------------------------------------------------------x

## COMPLAINT

      State Farm Mutual Automobile Insurance Company ("State Farm Mutual"),

for its complaint against defendants Vital Community Care P.C. ("Vital"), Amanda

Makki a/k/a Amanda Bazzi a/k/a Amale Bazzi ("Amanda Bazzi"), Namir David

Zukkoor, M.D. ("Zukkoor"), Martin Bloda, M.D. ("Bloda"), Mark J. Brennan,

M.D. ("Brennan"), Affiliated Diagnostic of Oakland, L.L.C. ("Affiliated Diagnostic"), Insight Diagnostics, L.L.C. ("Insight Diagnostics"), Warren J. Ringold, M.D. ("Ringold"), Nesreen Bazzi ("Nesreen Bazzi"), Ahmad Makki a/k/a Mike Makki ("Mike Makki"); Advanced Pain Specialists, P.L.L.C. ("Advanced Pain Specialists"), Ricardo D. Borrego, M.D. ("Borrego"), Jason A. Bitkowski, D.O. ("Bitkowski"), Hala Moussa a/k/a Hala Makki ("Hala Makki"), and Get Well Medical Transport Co. ("Get Well Transport"), (collectively, "Defendants"), alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action involves a scheme to fraudulently obtain money from State Farm Mutual by submitting, or causing to be submitted, bills and supporting documentation for services purportedly rendered to individuals ("patients") who have been in automobile accidents and are eligible for personal injury protection benefits ("No-Fault Benefits") under State Farm Mutual policies when, in fact, the services are either not performed or are not performed because they are medically necessary.  Instead, the services, if performed at all, are performed pursuant to a predetermined protocol ("Predetermined Protocol") that enriches Defendants, without regard to whether the services may actually be necessary to address the unique needs of any patient.

2.     Each defendant has a critical role in the scheme.  As explained below, Amanda Bazzi and Borrego are the primary drivers and economic beneficiaries of the scheme, and have created and/or rely upon the remaining defendants to play critical roles that are necessary to carry on and maximize the profitability of the scheme.

3.     Specifically, in or about January 2014, Amanda Bazzi created Vital to employ physicians whose role in the Predetermined Protocol is to purport to legitimately examine, diagnose, and refer patients who are eligible for No-Fault Benefits for services that are rendered by other providers that are either secretly owned and controlled by Amanda Bazzi or with whom Amanda Bazzi has unlawful kickback and fee-splitting arrangements.

4.     For purposes of context, it is important to understand the circumstances under which Amanda Bazzi created Vital.  Prior to creating Vital in or about January 2014, Amanda Bazzi secretly owned and controlled another medical practice, Medical Evaluations, PC ("Medical Evaluations"), together with physician Ram Gunabalan, M.D. ("Gunabalan").  Medical Evaluations[1] similarly employed physicians for the same purpose as Vital, namely to purport to legitimately examine, diagnose, and refer patients who are eligible for No-Fault

---

[1] On February 28, 2008, Medical Evaluations & Testing, P.C. was formed, purportedly by Terry Reznick, D.O. and was managed by Sherif El-Sayed.  Approximately a year later, it transitioned into Medical Evaluations P.C., which continued to be managed by Sherif El-Sayed.   Medical Evaluations & Testing, P.C. and Medical Evaluations P.C. are collectively referred to as "Medical Evaluations."

Benefits for services rendered by other providers that were secretly owned and controlled by Amanda Bazzi and/or Gunabalan.

5.     To conceal their true ownership and control of Medical Evaluations, Amanda Bazzi and Gunabalan paid a physician, James Beale, M.D. ("Beale"), to serve as the paper owner of the entity.  In fact, Beale was the owner of Medical Evaluations in name only, and Medical Evaluations existed to employ Beale and other physicians whose role was to examine, diagnose, and refer patients for services rendered by other providers secretly owned and controlled by Amanda Bazzi and Gunabalan.

6.     In November 2013, Allstate Insurance Company filed a civil racketeering and fraud case in the Eastern District Court of Michigan against Medical Evaluations, Beale and several other defendants, *Allstate Insurance Company, et al. v. Medical Evaluations, PC, et al.*, Case No. 2:13-cv-14682 ("Allstate's Medical Evaluations Lawsuit").   Allstate's Medical Evaluations Lawsuit alleged, among other things, that Beale and other physicians who worked for Medical Evaluations were engaged in a scheme to defraud Allstate by falsely purporting to legitimately examine and diagnose patients who were eligible for No-Fault Benefits and then referring them to other providers for services that either were not performed or were not medically necessary.

7.     Amanda Bazzi was not named as a defendant in the Allstate Medical Evaluations Lawsuit.  Nevertheless, approximately two months after that lawsuit was filed, Amanda Bazzi created Vital to assume the same role for her that Medical Evaluations had played.  At about the same time, Medical Evaluations stopped treating patients and many of its physicians, staff, and patients simply transferred to Vital.[2]

8.     Specifically, in or about January 2014, Vital was formed with Zukkoor serving as the paper owner.  In fact, Zukkoor is the owner of Vital in name only.  Prior to becoming the paper owner of Vital, Zukkoor worked at Medical Evaluations.  Indeed, many of Medical Evaluations' non-medical staff and patients, as well as several other physicians who had worked at Medical Evaluations, including defendants Bloda and Brennan, similarly shifted from Medical Evaluations to Vital.

9.     Vital continued to fill the role Medical Evaluations had played for Amanda Bazzi, namely employing Zukkoor, Bloda, and other physicians whose role in the Predetermined Protocol was to examine, diagnose, and refer patients for services rendered by other providers secretly owned and controlled by Amanda

---

[2] In April 2014, State Farm Mutual filed a civil racketeering and fraud lawsuit in the Eastern District of Michigan against Amanda Bazzi, Ram Gunabalan, Medical Evaluations and others, *State Farm Mutual Automobile Ins. Co. v. Pointe Physical Therapy, LLC, et al.*, Case No. 14-cv-11700 and, therefore, is not seeking any relief in this complaint based on claims from Medical Evaluations. Nevertheless, the circumstances surrounding Medical Evaluations are important to understand when and why Amanda Bazzi created Vital to carry on her scheme to exploit Michigan's unique No-Fault Benefits system, which allows for unlimited lifetime medical benefits.

Bazzi, including physical therapy clinics, defendants Affiliated Diagnostic and Insight Diagnostics for magnetic resonance imaging services ("MRIs"), and Brennan for electro-diagnostic tests ("EDX Tests").

10.    Shortly after creating Vital, Amanda Bazzi entered into an unlawful kickback and fee-splitting arrangement with Borrego and Advanced Pain Specialists.   Pursuant to their arrangement, physicians at Vital, including defendants Zukkoor and Bloda, routinely referred Vital's patients to Advanced Pain Specialists for pain management consultations as part of the Predetermined Protocol.  These pain management consultations served as a pretext for providing electro-acupuncture devices ("P-STIM Devices") to the patients.  Advanced Pain Specialists typically charged approximately $5,000 each time it provided a P-STIM Device.

11.    In addition, as part of their *quid pro quo* arrangement, Amanda Bazzi permitted Borrego, Bitkowski, Dr. Marc Orlewicz ("Orlewicz"),[3] and other physicians who worked for Advanced Pain Specialists to perform their services at Vital without any charge for the use of Vital's space, personnel, or equipment.

12.    To induce patient referrals from Vital to Advanced Pain Specialists, Borrego agreed to pay Amanda Bazzi and Vital 20% of the amounts collected by

---

[3] Starting in approximately July or August 2014, Dr. Orlewicz ("Orlewicz") worked as a physician at Advanced Pain Specialists, where he provided P-STIM Devices to patients of Vital.  Prior to that, Dr. Orlewicz worked at Vital.  Dr. Orlewicz passed away on December 22, 2016 and is not named as a defendant in this action.

Advanced Pain Specialists for the medically unnecessary pain management consultations and P-STIM Devices. This arrangement added an enormously lucrative dimension to the Predetermined Protocol. To illustrate how lucrative it was, between May 2014 (when Advanced Pain Specialists was formed) and June 2016, more than 115 of Vital's patients who were eligible for No-Fault Benefits under State Farm Mutual policies received medically unnecessary pain management consultations from Borrego, Bitkowski, Orlewicz and other physicians who worked for Advanced Pain Specialists which, in turn, served as the pretext for those patients to receive hundreds of P-STIM Devices.

13. The above-described arrangement between Amanda Bazzi and Borrego was unlawful. First, it violated MCL § 750.428, which makes it a criminal offense for any physician to divide fees or promise to pay part of his or her fees in exchange for a patient referral. It also likely violated MCL § 752.1004, which makes it a criminal felony offense for any person to receive or pay a kickback in connection with the furnishing of goods or services for which payment is or may be made by a health care insurer. These statutes are in place to protect the public health, safety, and welfare by prohibiting improper financial incentives that may interfere with a physician's exercise of independent medical judgment by inducing him to act in his own economic interest rather than his patients' best interests.

7

14.     Furthermore, from May 2014 through at least June 2016, Advanced Pain Specialists billed State Farm Mutual for medically unnecessary pain management consultations and P-STIM Devices provided to at least 87 patients at six other medical practices ("Other Bazzi Related Practices") that have connections with, and may also be secretly owned and controlled by Amanda Bazzi.[4] Advanced Pain Specialists has billed State Farm for medically unnecessary pain management consultations and more than 300 P-STIM Devices provided to those 87 patients.

15.     Although State Farm Mutual does not know the full extent of Amanda Bazzi's relationships with the Other Bazzi Related Practices or whether Amanda Bazzi and Borrego have the same unlawful kickback and fee-splitting arrangements that they have regarding Vital's patients, Vital and the Other Bazzi Related Practices are the only locations at which Advanced Pain Specialists provide any services.  Moreover, despite being a "pain management practice," pain management consultations and P-STIM Devices are virtually the only services performed by Advanced Pain Specialists.

---

[4] These Other Bazzi Related Practices are ProCare Injury & Rehab Centers L.L.C., Multicare Health Center L.L.C., Sinai Diagnostic Services, P.L.L.C., Executive Plaza Medical P.C., Flint Wellness & Diagnostic Center, P.L.L.C., and Greenfield Medical Orthopedic P.L.L.C. While these entities are not named as defendants at this time, State Farm Mutual's claims against Advanced Pain Specialists, Borrego, and Bitkowski in this case include the medically unnecessary pain management consultations and P-STIM Devices that Advanced Pain Specialists provided to patients at the Other Bazzi Related Practices and for which Advanced Pain Specialists submitted bills and supporting documentation to State Farm Mutual.

16.    The bills and supporting documentation that were submitted, and caused to be submitted, by Defendants for the above-described services were fraudulent because the services either were not performed or were not performed because they were medically necessary.  Instead, the services, if performed at all, were performed pursuant to the Predetermined Protocol which served the economic interests of Defendants, without regard to whether the services may actually have been necessary to address the unique needs of any patient.  As such, the bills and supporting documentation for these services were not owed.

17.    Specifically, Zukkoor, Bloda, and other physicians who worked for Vital falsely purported to examine patients, diagnose them, and refer them for services because they allegedly were medically necessary to address the patients' unique needs.  Instead, pursuant to the Predetermined Protocol, Zukkoor, Bloda, and other physicians who worked for Vital performed perfunctory examinations of the patients, diagnosed them with sprains and strains, typically to two or more regions of the spine, and prescribed physical therapy that usually occurred at physical therapy clinics secretly owned and controlled by Amanda Bazzi.[5]

18.    Approximately every 30 days Zukkoor, Bloda, and other physicians at Vital re-examined the patients, continued to diagnose them with sprains, strains, and other purported conditions, including radiculopathies and herniations, and

---

[5] These physical therapy facilities include Suncare Rehab, Inc., All Care Physical Therapy & Rehabilitation, Inc., and Access Plus Rehab, L.L.C.

9

continued to prescribe physical therapy.  These examinations and re-examinations were necessary to the success of the scheme, in part, because Michigan law requires a physician's prescription for physical therapy lasting more than 21 days or 10 treatments (whichever comes first).  *See* MCL § 333.17820.  The examinations and re-examinations were therefore necessary to enable physical therapy clinics, secretly owned and controlled by Amanda Bazzi, to bill for physical therapy services.

19.    The examinations and re-examinations by Zukkoor, Bloda, and other physicians who worked for Vital were also necessary to the success of the scheme, in part, because they allegedly supported the need for other services rendered by providers secretly owned and controlled by Amanda Bazzi, with the help of family members including Nesreen Bazzi and Mike Makki.

20.    In addition, the examinations and re-examinations by Zukkoor, Bloda, and other physicians who worked for Vital were necessary to the success of the scheme because they allegedly supported the need for the pain management consultations and P-STIM Devices provided by Borrego, Bitkowski, Orlewicz and other physicians who worked for Advanced Pain Specialists.

21.    As a result of the examinations and re-examinations by Zukkoor, Bloda, and other physicians who worked for Vital, patients were routinely determined to:  (a) be disabled from various activities of daily living, including

10

driving, which enabled defendant Get Well Transport to bill for transportation services provided to the patients; (b) need MRIs, which enabled defendants Affiliated Diagnostic and Insight Diagnostics to bill for MRI services, often to two or more regions of the spine, (c) need EDX Tests from Brennan, which enabled defendant Vital to bill for these services; and (d) need pain management consultations, which enabled Advanced Pain Specialists to bill for the consultations and P-STIM Devices.

22.     Because the above-described services were performed, if at all, pursuant to the Predetermined Protocol, and not to address the unique needs of the patients, the bills and supporting documentation submitted to State Farm Mutual for those services were fraudulent and the charges for those services were not owed.

23.     Finally, because Advanced Pain Specialists' pain management consultations that were performed on patients at the Other Bazzi Related Practices were performed as a pretext to provide medically unnecessary P-STIM Devices, the bills and supporting documentation submitted to State Farm Mutual by Advanced Pain Specialists for those services were fraudulent and the charges for those services were not owed.

24.     This action seeks a declaratory judgment that State Farm Mutual is not liable for any pending bills or bills that Defendants have submitted, and caused

11

to be submitted, to date and through the trial of this case based upon the above-described conduct.  This action also asserts common law claims for fraud, and unjust enrichment, as well as statutory claims under 18 U.S.C. §§ 1962(c) and (d) ("RICO"), to recover actual damages of more than $750,000 in No-Fault Benefits paid to Defendants, plus treble damages and costs, including reasonable attorneys' fees.

25.     State Farm Mutual has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association, or any other source for any of the charges at issue in this case.

## II.     JURISDICTION AND VENUE

26.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq.* because they arise under the laws of the United States.

27.     Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over claims that are so related to the claims over which it has original jurisdiction that they form part of the same case or controversy.

28.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because this is the jurisdiction where Defendants reside, and a substantial part of the events or omissions that gave rise to the claims occurred here.

## III.   PARTIES

### A.     Plaintiff

29.     State Farm Mutual is a citizen of Illinois.  It is a corporation organized under the laws of Illinois, with its principal place of business in Bloomington, Illinois.   At all relevant times, it was licensed in Michigan to engage in the business of insurance.

### B.     Defendants

#### 1.     Medical Clinic Defendants

##### a)     Vital Community Care

30.     On January 10, 2014, Vital Community Care P.C. was incorporated as a Michigan professional corporation.  It is a citizen of Michigan with its principal place of business at 24371 W. 10 Mile Road, Southfield, Michigan.

31.     Amanda Bazzi secretly owns and/or controls Vital, but to conceal her ownership and/or control, Zukkoor serves as its paper owner.

32.     From approximately January 2014 through the present, Vital has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for examinations and re-examinations performed

13

by Zukkoor, Bloda, and other physicians who have worked for Vital, as well as for EDX Tests performed by Brennan.   *See* Exs. 1–5.   Furthermore, these examinations and re-examinations were not performed to legitimately diagnose and address the unique needs of any patient, but instead were performed as part of the Predetermined Protocol to enable:   (a) Get Well Transport to submit bills and supporting documentation that are fraudulent for transportation services (*see* Ex. 1); (b) Affiliated Diagnostic and Insight Diagnostics to submit bills and supporting documentation that are fraudulent for MRI services (*see* Ex. 6); and (c) Advanced Pain Specialists to submit bills and supporting documentation that are fraudulent for pain management consultations and P-STIM Devices (*see* Ex. 7A).

### b)   Advanced Pain Specialists

33.   On May 8, 2014, Borrego incorporated Advanced Pain Specialists, P.L.L.C. as a Michigan professional limited liability corporation with its principal place of business in Michigan.   Borrego is the sole owner and member of Advanced Pain Specialists.  Because Borrego is a resident and citizen of Michigan, Advanced Pain Specialists is a citizen of Michigan.

34.   Advanced Pain Specialists is a citizen of Michigan, but does not have its own office location from which it practices.   Instead, Borrego, Bitkowski, Orlewicz and other physicians who work for Advanced Pain Specialists perform

14

pain management consultations and provided P-STIM Devices to patients at Vital and the Other Bazzi Related Practices.

35.     From its inception in or about May 2014 through at least 2016, Advanced Pain Specialists has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for pain management consultations and P-STIM Devices provided by Borrego, Bitkowski, and other physicians who worked for Advanced Pain Specialists at Vital and the Other Bazzi Related Practices.  *See* Exs. 7A, 7B.

### 2.     The MRI Facilities

#### a)     Affiliated Diagnostic of Oakland, L.L.C.

36.     On August 6, 2010, Affiliated Diagnostic of Oakland, L.L.C. was incorporated by Ringold as a Michigan corporation.  It is a citizen of Michigan with its principal place of business at 26550 Northwestern Highway, Southfield, Michigan.  According to a February 5, 2016 deposition from Ringold, he and Nesreen Bazzi own Affiliated Diagnostic.  Because its members, Ringold and Nesreen Bazzi, are residents and citizens of Michigan, Affiliated Diagnostic is a citizen of Michigan.

37.     According to a February 5, 2016 deposition from Ringold, Nesreen Bazzi owns 87.5% of Affiliated Diagnostic, but has no responsibilities at the facility.  Instead, he explained, "[s]he put up the money" and is "a completely

15

silent partner." In fact, Ringold and Nesreen Bazzi are nominee owners, Amanda Bazzi secretly owns and/or controls Affiliated Diagnostic and has taken affirmative steps to conceal her true ownership and financial interest, including using her daughter as a paper owner to conceal her ownership and control.

38.     Ringold was introduced to Amanda Bazzi and/or others working at her direction, including her brother Mike Makki, by Ringold's former business partner in Affiliated Medical of Dearborn, Dr. Luis Jorge. Affiliated Medical of Dearborn was an MRI provider in Michigan that was owned on paper by Dr. Luis Jorge but, in fact, was secretly owned and/or controlled by Amanda Bazzi from approximately 2010 to April 2012.

39.     Although Ringold is identified on public records as the incorporator of Affiliated Diagnostic, Ringold does not appear to have been involved in securing a space for the mobile MRI unit, or coordinating the construction of the MRI pad. Instead, Mike Makki and Dr. Luis Jorge spearheaded the process of obtaining a space for Affiliated Diagnostic. In approximately July 2010, Mike Makki and Dr. Luis Jorge began working with Balcom/Guido Assoc. Inc. construction services and Guido Architects Inc. to design and build a site for a mobile MRI unit. *See* Ex. 8A & 8B.

40.     In addition, Ringold does not appear to have been involved in obtaining the Certificate of Need ("CON") from Michigan's Department of

Community Health.  Between August and December 2010, Mike Makki and Dr. Luis Jorge worked with Alliance-HNV to obtain the necessary paperwork for the CON application.  Ex. 9A.  On January 5, 2011, Loren Rhoad sent an email notifying Mike Makki and Dr. Luis Jorge that the CON request was approved. Ringold was not included in this email.  *See* Ex. 9B.

41.    Shortly before the CON was approved, an operating agreement was created for Affiliated Diagnostic.  Under the Operating Agreement, Ringold was to "serve as the medical director of [Affiliated Diagnostic's] business" and was "responsible for medical oversight" of Affiliated Diagnostic.  The Operating Agreement also provided that "Nesreen Bazzi [or her designated person(s)] shall be responsible for all administrative and business operations." It also provided that Nesreen Bazzi "will be solely responsible for the initial capital contribution for [Affiliated Diagnostic], which [Affiliated Diagnostic] shall treat as a loan by her to be repaid by [Affiliated Diagnostic] before any distributions are made to the Members." *See* Ex. 10.

42.    Mike Makki has enabled Amanda Bazzi to maintain her secret ownership and control of Affiliated Diagnostic and to carry on the Predetermined Protocol by managing the day-to-day operations of Affiliated Diagnostic and its referral relationships with Vital and the Other Bazzi Related Practices.  *See* Ex. 11.

43.    Affiliated Diagnostic is an active MRI facility in Michigan.

17

44.    From the inception of Vital in or about January 2014 through the present, Affiliated Diagnostic has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for MRIs performed on Vital's patients based on prescriptions from Zukkoor, Bloda, and other physicians who worked for Vital.  *See* Ex. 6.  These bills and the supporting documentation were fraudulent and not owed because these services were performed pursuant to the Predetermined Protocol, not because they were medically necessary.

### b)    Insight Diagnostics, L.L.C.

45.    On March 11, 2013, Insight Diagnostics, L.L.C. was incorporated as a Michigan corporation.    According to documents submitted to Michigan's Department of Health, Insight uses a mobile MRI unit at 17000 Executive Plaza Drive, Dearborn, Michigan.  Because its members, Ringold, Nesreen Bazzi, and possibly Mike Makki, are residents and citizens of Michigan, Insight Diagnostics is a citizen of Michigan.

46.    Insight Diagnostics is co-owned on paper by Ringold and Amanda Bazzi's daughter, Nesreen Bazzi.  According to Ringold, Nesreen Bazzi owns 87.5% of the business.

47.    Amanda Bazzi's brother, Mike Makki, is listed as an owner or managing member in the supporting documentation for the Certificate of Need

18

application submitted to Michigan Department of Community Health by Insight Diagnostics in 2013.  *See* Ex. 12.

48.     In fact, Ringold, Nesreen Bazzi, and Mike Makki are nominee owners, and Amanda Bazzi secretly owns and/or controls Insight Diagnostics and took affirmative steps to conceal her true ownership and financial interest, including using her daughter and brother as paper owners to conceal her ownership and control.

49.     Mike Makki has enabled Amanda Bazzi to maintain her secret ownership and control of Insight Diagnostics and to carry on the Predetermined Protocol by managing the day-to-day operations of Insight Diagnostics and its referral relationships with Vital and the Other Bazzi Related Practices.

50.     Insight Diagnostics is an active MRI facility in Michigan.

51.     From the inception of Vital in or about January 2014 through the present, Insight Diagnostics has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for MRIs performed on Vital's patients based on prescriptions from Zukkoor, Bloda, and other physicians who worked for Vital.  *See* Ex. 6.  These bills and the supporting documentation were not owed because these services were not medically necessary, but were performed pursuant to the Predetermined Protocol.

19

### 3. The Transportation Company

52.     On June 9, 2009, Get Well Transport was incorporated as a Michigan corporation.  It is a citizen of Michigan, with its principal place of business at 27600 Northwestern Hwy, Southfield, Michigan.

53.     In public filings, Hala Makki is identified as the sole officer, incorporator, director, and resident agent of Get Well Transport, and she has testified that she has been the sole owner, officer and manager.

54.     In Hala Makki's bankruptcy proceedings, however, she represented to the court that she owns only a "1/3 interest in Get Well Transportation, Inc."

55.     Get Well Transport is an active transportation company in Michigan.

56.     From the inception of Vital in or about January 2014 through the present, Get Well Transport has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for transportation services provided to Vital's patients based on disability findings from Zukkoor, Bloda, and other physicians who worked for Vital.  *See* Ex. 1.  These bills and the supporting documentation were fraudulent and were not owed because these services were not medically necessary, but were performed pursuant to the Predetermined Protocol.

### 4. The Owners and Managers

#### a) Amanda Bazzi

57.     Amanda Bazzi is a resident and citizen of the state of Michigan.

58.    Amanda Bazzi has operated a network of facilities in Michigan targeting patients who have been in auto accidents and are eligible for No-Fault Benefits.   Amanda Bazzi has secretly owned and/or controlled these facilities, including Medical Evaluations, Vital, ProCare, MultiCare, Affiliated Diagnostic, and Insight Diagnostic, with the assistance of family members and close associates, including her brother Mike Makki, her daughter Nesreen Bazzi, her son-in-law Youssef Bakri, and her associate Sherif El-Sayed a/k/a Sherif Khalil, who have acted as nominee owners and/or managers of the facilities to conceal Amanda Bazzi's ownership and control.

59.    Amanda Bazzi secretly owns and controls Vital and directs its activities, including the implementation of the Predetermined Protocol and the services rendered by Advanced Pain Specialists pursuant to the unlawful kickback and fee-splitting arrangements she has with Borrego.

60.    Amanda Bazzi also secretly owns and/or controls Affiliated Diagnostic and Insight Diagnostics, and maintains an affiliation with Get Well Transport.

61.    From approximately January 2014 through the present, Amanda Bazzi has knowingly submitted and caused to be submitted fraudulent bills and supporting documentation from:  (a) Vital for examinations and re-examinations performed by Zukkoor, Bloda, and other physicians on Vital's patients (*see* Ex. 1),

21

as well as for EDX Tests performed by Brennan (*see* Exs. 2–5); (b) Get Well Transport for transportation services provided to Vital's patients (*see* Ex. 1); (c) Affiliated Diagnostic and Insight Diagnostics for MRI services performed on Vital's patients (*see* Ex. 6); and (d) Advanced Pain Specialists for pain management consultations and P-STIM Devices performed on Vital's patients (*see* Ex. 7A).

### b) Ricardo Borrego, M.D.

62.     Borrego is a resident and citizen of the state of Michigan.

63.     Borrego has been a licensed physician in Michigan since 1987.

64.     Borrego owns and controls Advanced Pain Specialists and directs its activities, including consultations that are performed by him, as well as Bitkowski, Orlewicz and other physicians who have worked for Advanced Pain Specialists on patients of Vital and the Other Bazzi Related Practices, as a pretext to provide medically unnecessary P-STIM Devices to those patients.

65.     Borrego also co-owns and controls the Eagle Advancement Institute, a Michigan corporation that became one of two master distributors in the United States market for certified P-STIM Devices in approximately December 2013.

66.     From the inception of Advanced Pain Specialists in or about May 2014 through at least 2016, Borrego has knowingly submitted, and caused to be submitted, bills and supporting documentation for pain management

22

consultations and P-STIM Devices provided by Borrego, Bitkowski, Orlewicz, and other physicians who have worked for Advanced Pain Specialists at Vital and the Other Bazzi Related Practices. *See* Exs. 7A and 7B. These bills and the supporting documentation were fraudulent and were not owed because these services were not performed because they were medically necessary to address the unique needs of the patients but instead served the economic interests of Amanda Bazzi and Borrego pursuant to their unlawful kickback and fee-splitting arrangement and to support the purported need for the other services described herein.

### c)    Hala Makki

67.    Hala Makki is a resident and citizen of the state of Michigan.

68.    Hala Makki has a long-standing personal and professional relationship with Amanda Bazzi.

69.    Until approximately 2005, she was married to Amanda Bazzi's first cousin, Tarek Makki.

70.    Furthermore, Hala Makki has been an active participant and collaborator in Amanda Bazzi's operation of a network of facilities in Michigan targeting patients who have been in auto accidents and are eligible for No-Fault Benefits. At the beginning of their relationship, Hala Makki worked with Amanda Bazzi to solicit patients involved in auto accidents to obtain treatment at facilities

owned and/or controlled by Amanda Bazzi.  Specifically, Dr. Irwin Lutwin—who worked at Medical Evaluations—testified he met Amanda Bazzi and Hala Makki in approximately the late 1990's through a mutual friend who told him that "[Amanda and Hala] [were] looking for a doctor to examine accident cases." Lutwin explained that Amanda Bazzi and Hala Makki worked together and "[a]s far as I know their job is just to bring patients in"—"Accident cases."  Lutwin further explained that Amanda Bazzi and Hala Makki were his "marketers." Indeed, for a period of time, Hala Makki actually worked out of his office.

71.    Several patients have testified that after their auto accidents they were directly solicited by Hala Makki, who steered them to obtain medical care with providers affiliated with Amanda Bazzi, and even met solicited patients at Amanda Bazzi's clinics to ensure that they began treatment.  For example:

- Patient J.S. testified that "Hala Makki" from "Medical Evaluation Testing" called him after his auto accident, "told me that I had been in an accident" and that "I had a suit" and "need to come down and get tested for my injuries."  J.S. later met Hala Makki during his initial visit at Medical Evaluations.

- Patient R.J. was contacted by phone by "Hala," who told her she got her contact information from the police report, stated she was from "Progressive" and "[t]hat she wanted us to see her doctor and lawyer and for us to start having therapy and stuff like that."  Dr. Raoof has testified that Progressive Therapy was owned by Amanda Bazzi and Sherif El-Sayed.

- Patient F.W. testified that a woman from Get Well Transport and Medical Evaluations called him after his auto accident, told him "[t]hat I was supposed to go to therapy for my accident, and told me I

24

have to go to the doctor once a month" and stated Get Well Transport would pick him up for his appointments.  The woman did not explain how she received his contact information.

72.     In addition to soliciting patients for Amanda Bazzi's clinics, Hala Makki has played other critical roles that are necessary to maintain and facilitate Amanda Bazzi's fraudulent operation, including helping Amanda Bazzi conceal her ownership and/or control of medical practices.  For example, in filings with Michigan's Secretary of State, Hala Makki has represented that she was the president, secretary, treasurer, and director of New Era PT Services, a physical therapy practice that was secretly owned and/or controlled by Amanda Bazzi. Indeed, although Amanda Bazzi was not identified in any of the filings with Michigan's Secretary of State, in a June 24, 2015 stipulation filed in *State Farm Mutual Automobile Ins. Co. v. Pointe Physical Therapy, LLC, et al*, she subsequently has admitted that she owns an interest in New Era PT Services. Furthermore, at least two employees of New Era, Michelle Klaty and Tiffany Lyles, have testified that Amanda Bazzi co-owned New Era PT Services with her associate, Sherif El-Sayed.  Indeed, Klaty further testified that Amanda Bazzi worked out of New Era, calling patients who missed appointments, and yelling at them for missing such appointments.

73.     Despite these long-standing personal and professional connections, Hala Makki has attempted to conceal her connection with Amanda Bazzi. Specifically, she has testified that she does not know Amanda Bazzi.

74.     In 2008, Hala Makki incorporated Get Well Transport to facilitate and maximize the profitability of Amanda Bazzi's fraudulent network of medical practices.  Since it was incorporated, Get Well Transport has provided substantial transportation services to patients at medical clinics owned and/or controlled by Amanda Bazzi, including Vital.   Indeed, Get Well Transport provided transportation services to at least 80% of patients who received prescriptions for transportation from physicians at Vital.

75.     The transportation services that Hala Makki controls and provides through Get Well Transport are part of a symbiotic relationship with Amanda Bazzi, and are critically important to the fraud scheme.  Specifically, Amanda Bazzi ensures that Vital providers make an explicit finding that the majority of Vital patients have disabilities that render them unable to drive, regardless of the patients' actual condition.  These medically unnecessary disability determinations by the Vital providers result in Vital patients being referred to Hala Makki's transportation company for transport to and from Vital.  This arrangement provides mutual benefits to both Hala Makki and Amanda Bazzi.  Specifically, Hala Makki benefits from the steady flow of patient transportation referrals from Amanda

Bazzi, for which she can then bill State Farm.  In turn, Amanda Bazzi benefits from ensuring that the vast majority of Vital patients who receive transportation services will not miss appointments at Vital.

76.    Hala Makki has admitted in testimony that prior to forming Get Well Transport, she had no prior experience in the transportation field and has no medical training.  Hala Makki further testified that nearly all of their fares are paid by auto-insurers on PIP claims and that it is the business protocol of Get Well Transport to transport patients that have disability certificates to support its charges to State Farm and other insurers for the transportation services.

77.    Although Hala Makki has testified that she is the sole owner, officer and manager of Get Well Transport, in her 2005 federal bankruptcy proceedings, she represented to the court that she owns only a "1/3 interest in Get Well Transportation, Inc."  Moreover, the former office manager of Michigan Visiting Physicians P.C., another medical practice owned and/or controlled by Amanda Bazzi, has testified that Hala Makki was "part of the transportation company with [Sherif El-Sayed]," who has managed several medical clinics owned and/or controlled by Amanda Bazzi.

78.    From approximately January 2014 through the present, Hala Makki has knowingly submitted, and caused to be submitted, bills and supporting

documentation from Get Well Transport that fraudulently bill for transportation services provided to Vital's patients (*see* Ex. 1).

### d)   Warren J. Ringold, M.D.

79.   Ringold is a resident and citizen of the state of Michigan.

80.   Ringold has been a licensed physician in Michigan since 1976.

81.   Ringold purports to be a minority owner and medical director of defendants Affiliated Diagnostic and Insight Diagnostics.

82.   Ringold was introduced to Amanda Bazzi and/or others working at her direction, including her brother Mike Makki, by Ringold's former business partner in Affiliated Medical of Dearborn, Dr. Luis Jorge. Affiliated Medical of Dearborn was an MRI provider in Michigan that was owned on paper by Dr. Luis Jorge but, in fact, was secretly owned and/or controlled by Amanda Bazzi from approximately 2010 to April 2012.

83.   From the inception of Vital in or about January 2014 through the present, Ringold has knowingly submitted, and caused to be submitted, bills and supporting documentation from Affiliated Diagnostic and Insight Diagnostics that are fraudulent for MRIs performed on Vital's patients based on prescriptions from Zukkoor, Bloda, and other physicians who worked for Vital. *See* Ex. 6. These bills and the supporting documentation were fraudulent and were not owed because

these services were performed pursuant to the Predetermined Protocol, and not because they were medically necessary.

### e)   Nesreen Bazzi

84.   Nesreen Bazzi is Amanda Bazzi's daughter and is a resident and citizen of the state of Michigan.

85.   Nesreen Bazzi falsely purports to be the majority owner of defendants Affiliated Diagnostic and Insight Diagnostics to facilitate the scheme by concealing Amanda Bazzi's true ownership and control of those entities, which maximize the profitability of the Predetermined Protocol by performing MRIs on patients who were treated at Vital and other practices that are or were secretly owned and/or controlled by Amanda Bazzi.

86.   Nesreen Bazzi has served as a nominee owner of several practices and facilities secretly owned and/or controlled by her mother, Amanda Bazzi, including Affiliated Diagnostic and Insight Diagnostics.

87.   From the inception of Vital in or about January 2014 through the present, Nesreen Bazzi has knowingly submitted, and caused to be submitted, bills and supporting documentation from Affiliated Diagnostic and Insight Diagnostics that are fraudulent for MRIs performed on Vital's patients based on prescriptions from Zukkoor, Bloda, and other physicians who worked for Vital.  *See* Ex. 6. These bills and the supporting documentation were fraudulent and were not owed

because these services were performed pursuant to the Predetermined Protocol, and not because they were medically necessary.

### f)   Mike Makki

88.   Mike Makki is Amanda Bazzi's brother and is a resident and citizen of the state of Michigan.

89.   Ringold was introduced to Mike Makki by Ringold's former business partner in Affiliated Medical of Dearborn, Dr. Luis Jorge.  Affiliated Medical of Dearborn was an MRI provider in Michigan that was owned on paper by Dr. Luis Jorge but, in fact, was secretly owned and/or controlled by Amanda Bazzi from approximately 2010 to April 2012.

90.   Mike Makki has enabled Amanda Bazzi to maintain her secret ownership and control of Affiliated Diagnostic and Insight Diagnostics and to carry on the Predetermined Protocol first by facilitating the creation of these entities, including the submission of documents to obtain a Certificate of Need from Michigan's Department of Community Health, and then by continuing to manage the day-to-day operations of Affiliated Diagnostic and Insight Diagnostics and their referral relationships with Vital and the Other Bazzi Related Practices.

91.   From the inception of Vital in or about January 2014 through the present, Mike Makki has knowingly submitted, and caused to be submitted, bills and supporting documentation from Affiliated Diagnostic and Insight Diagnostics

30

that are fraudulent for MRIs performed on Vital's patients based on prescriptions from Zukkoor, Bloda, and other physicians who worked for Vital.  *See* Ex. 6. These bills and the supporting documentation were fraudulent and were not owed because these services were performed pursuant to the Predetermined Protocol, and not because they were medically necessary.

### 5.    The Rendering Providers

#### a)    Namir David Zukkoor, M.D.

92.    Zukkoor is a resident and citizen of the state of Michigan.

93.    Zukkoor has been a licensed physician in Michigan since 1983.

94.    Zukkoor previously worked as a physician at Medical Evaluations, where he referred patients to physical therapy facilities, diagnostic testing facilities, and transportation entities secretly owned and/or controlled, in part, by Amanda Bazzi.

95.    In January 2014, Zukkoor became the paper owner of Vital and has continued to serve the same role for Amanda Bazzi at Vital that he had at Medical Evaluations, namely to purportedly examine and diagnose patients, and then refer them to other providers that are secretly owned and controlled by Amanda Bazzi, or with whom Amanda Bazzi has an unlawful kickback and fee-splitting arrangement.

96.    From approximately January 2014 through the present, Zukkoor has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent from:   (a) Vital for examinations and re-examinations performed on Vital's patients by Zukkoor, Bloda, and other physicians who have worked for Vital, as well as for EDX Tests performed by Brennan (*see* Exs. 1–5); (b) Get Well Transport for transportation services provided to Vital's patients (*see* Ex. 1); (c) Affiliated Diagnostic and Insight Diagnostics for MRI services performed on Vital's patients (*see* Ex. 6); and (d) Advanced Pain Specialists for pain management consultations and P-STIM Devices provided to Vital's patients (*see* Ex. 7A).

### b)    Martin Bloda, M.D.

97.    Bloda is a resident and citizen of the state of Michigan.

98.    Bloda has been a licensed physician in Michigan since 2012.

99.    Bloda previously worked as a physician at Medical Evaluations, where he referred patients to physical therapy facilities, diagnostic testing facilities, and transportation entities secretly owned and/or controlled by Amanda Bazzi.

100.   In approximately January 2014, Bloda transitioned from Medical Evaluations to Vital, and has continued to serve the same role for Amanda Bazzi at Vital that he had at Medical Evaluations, namely to purportedly examine and

diagnose patients, and then refer them to other providers that are secretly owned and controlled by Amanda Bazzi, or with whom Amanda Bazzi has an unlawful kickback and fee-splitting arrangement.

101. From approximately January 2014 through 2016, Bloda has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent from:   (a) Vital for examinations and re-examinations performed on Vital's patients by Zukkoor, Bloda, and other physicians who have worked for Vital, as well as for EDX Tests performed by Brennan (*see* Exs. 1–5); (b) Get Well Transport for transportation services provided to Vital's patients (*see* Ex. 1); (c) Affiliated Diagnostic and Insight Diagnostics for MRI services performed on Vital's patients (*see* Ex. 6); and (d) Advanced Pain Specialists for pain management consultations and P-STIM Devices provided to Vital's patients (*see* Ex. 7A).

### c)   Mark Brennan, M.D.

102.   Brennan is a resident and citizen of the state of Michigan.

103.   Brennan has been a licensed physician in Michigan since 1988.

104.   From approximately 2009 until January 2014, Brennan worked as a physician at Medical Evaluations, where he purported to perform EDX Tests.

105.   In approximately January 2014, Brennan transitioned from Medical Evaluations to Vital, and has continued to serve the same role for Amanda Bazzi at

Vital that he had at Medical Evaluations, namely to purportedly perform EDX Tests that were allegedly medically necessary.

106.   From at least January 2014 through the present, Brennan has purportedly performed EDX Tests on Vital's patients, typically performing services no more than one day per week.  Brennan did not perform EDX Tests because they were medically necessary, and did not perform or interpret the EDX Tests properly.

107.   From the inception of Vital in January 2014 through the present, Brennan has knowingly submitted, and caused to be submitted, bills and supporting documentation from Vital that are fraudulent for EDX Tests performed on Vital's patients based upon referrals from Zukkoor, Bloda, and other physicians who worked for Vital.  *See* Exs. 2–5.

### d)   Jason A. Bitkowski, D.O.

108.   Bitkowski is a resident and citizen of the state of Michigan.

109.   Bitkowski has been a licensed osteopathic physician in Michigan since 2006.

110.   From approximately August 2014 through at least 2016, Bitkowski has knowingly submitted, and caused to be submitted, bills and supporting documentation from Advanced Pain Specialists that were fraudulent and were not

owed for pain management consultations and P-STIM Devices provided to patients of Vital and the Other Bazzi Related Practices.  *See* Exs. 7A and 7B.

## IV.   ALLEGATIONS COMMON TO ALL COUNTS

### A.   First-Party Claims for Payment Under the No-Fault Act

111.   Under Michigan's No-Fault Act, insurers are required to pay No-Fault Benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those benefits are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle."  MCL §§ 500.3105, 3107(1)(a).

112.   For the reasons described herein, the Defendants knew that the charges at issue in this complaint were not for reasonably necessary medical services for an injured person's care, recovery, or rehabilitation, and therefore were not owed.

### B.   Third-Party Tort Claims for Non-Economic Loss Under the No-Fault Act

113.   Under Michigan's No-Fault Act, individuals who are not at fault for the accidents underlying their claims can also potentially recover: (a) non-economic losses, such as for pain and suffering, from the drivers who were at fault for the accident ("At-Fault Drivers") through a claim for bodily injury (a "BI Claim"), only in limited situations, including if the individual has suffered

35

serious impairment of body function, *see* MCL § 500.3135, or (b) if recovery under the BI Claim is insufficient to fully compensate the individuals who are not at fault, from the individual's own insurance company through an uninsured or underinsured motorist claim (a "UM Claim").

114.   An individual has suffered serious impairment of body function when his or her general ability to conduct the normal course of his or her life has been affected as a result of his or her injury.   A determination of whether this has occurred requires an analysis of the totality of the circumstances, including:  (a) the nature and extent of the impairment; (b) the type and length of treatment required; (c) the duration of the impairment; (d) the extent of any residual impairment; (e) the prognosis for eventual recovery; and (f) whether there is "objective manifestation" of the injury.

115.   Defendants' scheme, including the bills and supporting documentation they have submitted, and caused to be submitted, to State Farm Mutual were designed to exploit the patients' No-Fault Benefits, as well as to support a finding that the patients suffered serious impairments of body functions, regardless of whether they had or not, to establish the threshold for and inflate the value of potential BI and UM Claims.

## C.     The Background And Evolution Of The Scheme

### 1.     Amanda Bazzi Has Relied on Physicians, Family Members, and Others to Enable Her to Secretly Own and Control a

**Network of Healthcare Providers Designed to Maximize Her Ability to Profit from Michigan's No-Fault System.**

116.  Amanda Bazzi has secretly owned and controlled a highly lucrative network of facilities for the purpose of exploiting Michigan's No-Fault Benefit system.  The names of these facilities and the identity of the physicians, family members, and others who have enabled her to maintain her secret ownership and control have changed over time, but the nature of the activities have not.  Family members and others who have knowingly facilitated her secret ownership and control of various facilities over many years include her brothers Mike Makki and Nazih Makki, her sister Fatmeh ("Faye") Chehab, her daughter Nesreen Bazzi, her son-in-law Youssef Bakri, as well as close associates, including Sherif El-Sayed a/k/a Sherif Khalil and Hala Makki.

117.  As discussed at paragraphs 4–9 above, Vital simply picked up where Medical Evaluations left off, with many of the same physicians, including Zukkoor, Bloda and Brennan, and same staff, playing the same role that they had for Medical Evaluations.

118.  In addition to the above-described commonalities between Medical Evaluations and Vital, surveillance of Vital from February 9, 2015 through February 13, 2015 showed that Amanda Bazzi's car was at Vital four out of those five days.  This surveillance also showed the car of Amanda Bazzi's son-in-law, Youssef Bakri, at Vital all five days.

37

119.   Bloda explained his transition from Medical Evaluations to Vital in a March 11, 2015 deposition by testifying that "Amanda" told him that "this is where you'll work where you can work under [Dr. Zukkoor]."   Bloda further testified that he would see "Amanda" in [Vital's] office.

120.   Testimony of Dr. Haladjian, who worked at Vital and other entities owned and/or controlled by Amanda Bazzi, further supports Amanda Bazzi's secret ownership and/or control of Vital.   According to a November 19, 2015 deposition of Dr. Haladjian, he was recruited to work at Vital by his friend Sherif Khalil, a name used by Amanda Bazzi's associate and the manager of Medical Evaluations, Sherif El-Sayed.

121.   In addition to Zukkoor and Bloda, several physicians who had treated patients for Medical Evaluations performed the same services for Vital's patients. These physicians include Brennan, Dr. Ross Halpern, and Dr. Haladjian.

122.   According to the March 10, 2016 deposition testimony of Vital's office manager Malak Bazzi, she and other non-medical personnel, including the scheduler and receptionist, also transferred from Medical Evaluations to Vital.

123.   Additionally, more than 50 patients who treated with Zukkoor and/or Bloda at Medical Evaluations around the time that Allstate's Medical Evaluations Lawsuit was filed in November 2013 later became Vital's patients, with nothing

38

more but a change in letterhead, and no indication of a patient transferring from different facilities.

### 2.   Borrego Joins The Scheme.

124.   At approximately the same time that Amanda Bazzi was morphing Medical Evaluations into Vital, Borrego used the Eagle Advancement Institute to obtain "master distributor" rights for the United States market for Biegler P-STIM Devices.

125.   The P-STIM Device is a miniaturized electro-acupuncture device that is attached to the ear and purportedly transmits low frequency electrical impulses. It is controlled by a microchip, which is powered by a battery that lasts four days, at which point it can be removed by the patient.  Borrego testified in an October 5, 2015 deposition that to use the P-STIM Device, a licensed physician applies liquid adhesive on the ear and then places the P-STIM Device unit on the adhesive. Although in a July 1, 2015 deposition Borrego also testified that this can be done in an in-office setting and takes 15-20 minutes to apply, Orlewicz testified in a May 20, 2015 deposition that it only takes him five minutes to apply the P-STIM Device.

126.   While the P-STIM Device is marketed as an "electro-acupuncture device," the physicians at Advanced Pain Specialists do not use any acupuncture mapping or theories to determine where the electrodes should be attached, or how

the device should be utilized.  In fact, Borrego, Bitkowski, and Orlewicz have all testified that they have never received any training in and/or practiced acupuncture. The Eagle Advancement Institute also advertised that the P-STIM Device is supported by randomized, controlled studies, and in a September 14, 2015 deposition, Borrego testified that it is covered by Medicare and Blue Cross.  These representations are false.  Neither Medicare nor Blue Cross cover P-STIM Devices. *See* Ex. 13.   There are ***no*** randomized, controlled studies published in the peer-reviewed medical literature demonstrating the efficacy of the P-STIM Device for acute or chronic pain related to the types of soft tissue, neurological, and other conditions that may result from a car accident, indicating that, at most, the P-STIM Device is of highly questionable medical value.   As documented below, the predetermined manner in which Borrego and his associates prescribe the P-STIM render it of no medical value under these circumstances.

127.  Despite the absence of any randomized, controlled studies published in the peer-reviewed medical literature, and without any training in acupuncture, Borrego formed Advanced Pain Specialists shortly after becoming a distributor of the P-STIM Device.  Borrego then hired Bitkowski and Orlewicz, and they and other physicians who have worked for Advanced Pain Specialists, prescribed and administered hundreds of P-STIM Devices to approximately 200 State Farm Mutual insureds at Vital and the Other Bazzi Related Practices.

128.   Advanced Pain Specialists is not a legitimate pain management practice.   In legitimate pain management settings, treatments are tailored to patients' unique needs and do not rely almost exclusively on a pain management treatment, like the P-STIM Device that is unproven.   For instance, legitimate pain management treatments may include anti-inflammatories or other pain medications, continued conservative care, injections, surgical interventions, or any combination of these, depending on each patient's unique needs.

129.   Indeed, according to Bitkowski, administering P-STIM Devices is the only procedure he has ever performed at Advanced Pain Specialists, even though he claims competence in pain management injections.   When asked why he only used the P-STIM Device to the exclusion of all other forms of treatment, Bitkowski confirmed that there was no medical basis for this decision, but yet could not provide an explanation for this practice, testifying, "I don't do [injections] there; I just don't."

130.   After Eagle Advancement Institute became a master distributor for the P-STIM Device and Advanced Pain Specialists was formed, Borrego needed access to patients to whom he could provide the P-STIM Devices.   Borrego did not have a readily available pool of patients because he had been practicing as an anesthesiologist, providing anesthesia services for the patients of other physicians rather than treating his own patients.   Thus, Borrego needed facilities and

physicians willing to refer their patients to Advanced Pain Specialists for P-STIM Devices, and this is the context in which his partnership with Amanda Bazzi was born.

131.   Amanda Bazzi could benefit Borrego by feeding him a steady stream of patient referrals at Vital and possibly the Other Bazzi Related Practices.  In return, Borrego could benefit Amanda Bazzi by having those patients diagnosed by himself and other physicians with conditions that allegedly required P-STIM Devices, which supported the other treatment the patients were receiving.

132.   Borrego agreed to kickback 20% of the fees collected by Advanced Pain Specialists in return for referrals from Vital and the free use of Vital's space, personnel and equipment.  Since May 2014, this unlawful arrangement has resulted in hundreds of P-STIM Devices being provided to at least 118 patients at Vital who were eligible for No-Fault Benefits from State Farm Mutual.

133.   In addition, approximately 300 more P-STIM Devices have been provided to at least 87 patients at the Other Bazzi Related Practices, who were similarly eligible for No-Fault Benefits from State Farm Mutual.

### D.   Defendants Cultivate *Quid Pro Quo* Relationships with Personal Injury Attorneys and Solicitors to Obtain Patients

134.   The economic success of Defendants' scheme depends on gaining access to a steady stream of patients.  Thus, to maximize profits, Vital and Amanda Bazzi have developed cross-referral relationships with personal injury attorneys

and also employed and used runners, cappers, and steerers to solicit patients and direct them to Vital.

135.   This solicitation activity is unlawful.   Specifically, it is a criminal misdemeanor offense in Michigan for any medical provider to knowingly "employ any solicitor, capper, or drummer for the purpose of procuring patients."   MCL § 750.429.   Michigan law further defines a "fraudulent insurance act" as one in which "any person who knowingly, and with an intent to injure, defraud, or deceive . . . [e]mploys, uses, or acts as a runner, capper, or steerer with the intent to falsely or fraudulently obtain benefits under a contract of insurance . . . ." MCL§ 500.4503.

136.   Several of Vital's patients have confirmed they were directly (and therefore unlawfully) solicited shortly after their accidents to seek treatment at Vital.   For example, Patient S.B. testified she was contacted by a woman named "Sarah" shortly after her accident.   S.B. stated that "Sarah" told S.B. that she needed urgent care, and S.B. thought that "Sarah" was calling on behalf of State Farm Mutual and that it was her insurance company, State Farm Mutual, directing her to Vital for treatment.   S.B. further testified that she only went to Vital on one occasion because it "seemed really awkward" and "right after the doctor" treated her, "an attorney came right in and started asking [her] questions."   S.B. stated that

the attorney had an office inside Vital and the same attorney called her "five or six times" until S.B. put his number on a telephone call "block list."

137.   Similarly, Patient M.T. testified that she received a call about one day after her accident and the caller stated that he had obtained her phone number from a police report.  M.T. stated that the caller told her she could "go and talk to this attorney" and the "lawyer would send [her] to their doctor."  M.T. further testified that two people, a man and a woman, came to her house with a lot of paperwork, and sent the paperwork directly to Bloda at Vital.

138.   Patient A.R. also testified that he was called by an unidentified man the day after his accident.  A.R. testified that the man told A.R. he was from a "lawyer agency," had received A.R.'s number from the hospital, and was going to "take [his] case."  The unidentified man then went to A.R.'s home the day after he initiated contact and directed A.R. to seek treatment at Vital, telling A.R. that A.R. should see "these doctors" because it would be "helpful" for his lawsuit (although there was no lawsuit at the time).

139.  Vital's patients have further confirmed that Legal Genius solicits patients to treat at Vital.   For example, Vital patient M.K. testified that she received a call at home the day after her auto accident.  M.K. stated that the attorney arrived in a car with the logo "legalgenius.com" on it.  M.K. testified that the man gave her a brochure, had her sign a statement acknowledging that the use

of social media in a personal injury case may damage her claim, and had her sign an attorney/client representation agreement.  M.K. further testified that the attorney directed her and her husband to seek treatment with Bloda.  M.K. stated that she told the attorney that she was uninjured and that all she had was a stiff neck, and the attorney told her, "you have a stiff neck, go and see Dr. Bloda."

140.  Vital patient S.W. testified that an attorney from Legal Genius contacted him after his accident, came to his house, and set up an appointment for S.W. at Vital.  S.W. confirmed that he did not initiate contact with anyone from Legal Genius and had never heard of Vital before the Legal Genius representative directed him to seek treatment at Vital.

### E.    Defendants' Fraudulent Treatment of the Patients

141.  From at least January 2014 through the present, Defendants have acted in concert to carry on their scheme with each playing different roles that are essential to the success of the scheme.  Specifically, Zukkoor, Ringold, and Nesreen Bazzi have enabled Amanda Bazzi to maintain secret ownership and control of Vital, Affiliated Diagnostic, and Insight Diagnostics by acting as paper owners of those entities, Mike Makki has enabled Amanda Bazzi to maintain secret ownership and control of Affiliated Diagnostic and Insight Diagnostics by managing their operations and referral relationships with Vital and the Other Bazzi Related Practices, Brennan, Bloda, Zukkoor, and Orlewicz have used their status as

physicians to implement the Predetermined Protocol of examinations and referrals, Borrego and Bitkowski have used their status as physicians to prescribe and provide P-STIM Devices, and Hala Makki manages Get Well Transport to facilitate and maximize the profitability of Amanda Bazzi's fraudulent network of medical practices, providing substantial transportation services to patients at medical clinics owned and/or controlled by Amanda Bazzi, including Vital.

142.   The Predetermined Protocol begins at Vital, where patients receive initial examinations and re-examinations from Zukkoor, Bloda, and other physicians who have worked for Vital that are not designed to legitimately assess and address any patient's unique needs, but are done to facilitate the Predetermined Protocol by finding that the patients are disabled from various activities of daily living, including driving, to support the alleged need for transportation services from Get Well Transport, and by referring the patients for other services, without any regard for whether they are needed or not, including EDX Tests from Brennan, MRIs from Affiliated Diagnostic and Insight Diagnostics, and pain management consultations that served as a pretext for P-STIM Devices from Advanced Pain Specialists.

143.   The patterns in the examinations and referrals, as well as the corresponding documentation generated by Zukkoor, Bloda, and other physicians

who have worked for Vital, reveal no meaningful effort to consider or integrate the results of EDX Tests and MRIs into the patients' diagnosis or treatment plans.

144.   The charts attached hereto as Exhibits 1–7B set forth the claims in which Defendants submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation that include fraudulent examinations and re-examinations purportedly performed on Vital's patients, as well as the corresponding referrals of those patients for transportation, EDX Tests, MRIs, and pain management consultations that served as a pretext for P-STIM Devices from Advanced Pain Specialists.

## 1.   Legitimate Treatment of Patients with Strains, Sprains, and Radiculopathy Generally.

145.   When an individual has been in an auto accident and seeks treatment for neck or back pain, a licensed professional must obtain a history and perform an examination to arrive at a legitimate diagnosis.  Based upon a legitimate diagnosis, a licensed professional must then engage in medical decision-making to design a treatment plan that is tailored to the unique needs of each patient.

146.   A sprain is a stretch and/or tear of a ligament, the fibrous band of connective tissue that joins the end of one bone with another.  Ligaments stabilize and support joints.

147.   A strain is an injury to a muscle that is caused by tears in the muscle fibers caused by overstretching.

148.   The human nervous system is composed of the brain, spinal cord, and peripheral nerves, which extend throughout the body, including the arms and legs, and into the hands and feet.  Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body. The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

149.   Peripheral nerves consist of both sensory and motor nerves.  They travel throughout the body and extend from the hands and feet through the arms and legs and into the spinal cord.  The peripheral nerves come together at various specific points along the spine before traveling up the spinal cord to the brain.  The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  Damage or injury to a nerve root is called a radiculopathy and can cause various symptoms including pain, altered sensation, and loss of muscle control.

150.  Legitimate treatment plans for individuals with strains, sprains, as well as radiculopathy, may involve no treatment at all (because many of these kinds of injuries heal within weeks without any intervention), anti-inflammatories

or other pain relief medications, passive modalities (such as electrical stimulation, heat, and massage which do not require active movement by the patient), and/or active therapies (such as stretching, exercise, and muscle strengthening which require active movement by the patient).

151.  If the above-described methods of conservative care fail, treatment can also include non-invasive or minimally invasive pain management, which is typically provided through a wide variety of clinically proven and well established pain relief medications and/or minimally invasive injections, the indications for which depend on each patient's unique conditions and response to treatment. Surgical intervention may be appropriate if these pain management techniques fail.

152.  The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various treatments, should vary depending on the patient's unique needs, including:  (a) age and medical history; (b) physical condition, limitations, and abilities; (c) location, nature, and severity of injury and symptoms; and (d) response to treatment.

153.  Treatment plans should be periodically reassessed based upon updated histories, re-examination findings, reported pain levels, and return to functionality, and should be modified if necessary to address the patients' unique needs. Diagnoses and treatment plans should integrate diagnostic test results, such as MRIs and EDX Tests.

154.   The examination, diagnosis, and treatment plan should be documented with sufficient information to support a differential diagnosis, substantiate the need for treatment, and describe the course and results of treatment for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient; and (c) the patients themselves whose care may depend on valid documentation of this information.

155.   Patients should be discharged from treatment when they have reached maximum medical improvement, such that no further treatment is likely to benefit the patient.

### 2.   Vital's Fraudulent Initial Examinations And Reexaminations.

156.   The Predetermined Protocol necessarily begins with and is carried on as a result of examinations performed by Zukkoor, Bloda, and other physicians who have worked for Vital, when the patients begin their treatment and then are periodically reassessed throughout the course of their treatments.   The vast majority of these examinations were performed by Bloda and Zukkoor.  As shown in Exhibit 1, these examinations are not legitimate and are not intended to legitimately evaluate the patient's injuries, create an appropriate treatment plan, and/or tailor the plan to the patient's response to treatment (or lack thereof).

157.   Specifically, Zukkoor, Bloda, and other physicians who worked for Vital performed perfunctory examinations of the patients, diagnosed them with

sprains and strains typically to two or more regions of the spine, and prescribed physical therapy that usually occurred at physical therapy clinics secretly owned and controlled by Amanda Bazzi.[6]  Approximately every 30 days Zukkoor, Bloda, and other physicians at Vital re-examined the patients, and continued to prescribe physical therapy.  These examinations and re-examinations were necessary to the success of the scheme, in part, because Michigan law requires a physician's prescription for physical therapy lasting more than 21 days or 10 treatments (whichever comes first).  *See* MCL § 333.17820.  The examinations and re-examinations were therefore necessary to enable physical therapy clinics secretly owned and controlled by Amanda Bazzi to bill for physical therapy services, without regard to whether the services were necessary.

158.  The examinations and re-examinations by Zukkoor, Bloda, and other physicians who worked for Vital were also necessary to the success of the scheme, in part, because they were used as pretexts to support the alleged need for other services rendered by providers who were secretly owned and controlled by Amanda Bazzi, as well as for the pain management consultations and P-STIM Devices provided by Borrego, Bitkowski, Orlewicz, and other physicians who worked for Advanced Pain Specialists.

---

[6] These physical therapy facilities include Suncare Rehab, Inc., All Care Physical Therapy & Rehabilitation, Inc., and Access Plus Rehab, L.L.C.

159. Specifically, as a result of the examinations and re-examinations by Zukkoor, Bloda, and other physicians who worked for Vital, patients were routinely determined to: (a) be disabled from various activities of daily living, including driving, which enabled defendant Get Well Transport to bill for unnecessary transportation services; (b) need MRIs, which enabled defendants Affiliated Diagnostic and Insight Diagnostics to bill for unnecessary MRI services, often to two or more regions of the spine; (c) need EDX Tests from Brennan, which enabled defendant Vital to bill for these unnecessary services; and (d) need pain management consultations, which enabled Advanced Pain Specialists to bill for the consultations and P-STIM Devices.

160. When the documentation for the examinations and re-examinations purportedly performed on Vital's patients are viewed together, patterns in the documentation reveal there was no legitimate attempt to accurately evaluate patients' injuries, reach a differential diagnosis, and create an appropriate, individually tailored treatment plan.

161. Instead, those patterns reveal that the examinations, if they were performed at all, were perfunctory and the outcomes were predetermined. Indeed, most patients received: (a) disability findings, which allegedly supported transportation charges from Get Well Transport; (b) prescriptions for physical therapy or chiropractic services; (c) prescriptions for MRIs; (d) referrals for EDX

testing; and (e) referrals for pain management consultations that ultimately resulted in P-STIM devices.

162.   Amanda Bazzi either secretly owns and controls or has an unlawful referral arrangement with the provider of each of these services.  For example, Get Well Transport is owned, at least on paper, by Hala Makki, who was formerly married to Amanda Bazzi's first cousin.  Amanda Bazzi secretly owns and controls Vital, where patients were referred for physical therapy or chiropractic services. Amanda Bazzi's brother and daughter operate the MRI facilities that receive referrals from Vital, and Advanced Pain Specialists had an unlawful kickback and fee-splitting arrangement with Amanda Bazzi to induce referrals.

163.   Because   the   outcomes   of   the   examinations   performed   are predetermined, basic principles for examining patients are not used and the outcomes are the same regardless of any information that is documented from the examinations.

164.   For example, although documentation from the examinations often reports that patients complained of pain in multiple regions of the spine, as well as in their extremities, the pain scores that are recorded (if they are recorded at all) are typically a single pain score or other rating for the patient as a whole, which has minimal, if any, clinical value because it provides no information about the pain levels that the patient was experiencing in any particular region of the spine, any

specific limb, or area of the body.  Documenting a patient's pain score or other rating is basic and important to establish a baseline against which to measure a patient's progress or lack thereof over time and in response to various forms of treatment.

165.   Similarly, documentation from the examinations either omits any reference to any range of motion patients may have in any area of the body, including any region of the spine, any joint or any limb, or reports that the range of motion was "decreased" without any attempt to identify whether it was decreased from the range of motion the patient had before the accident or the degree to which it was decreased.  Documenting a patient's range of motion and the degree to which it is decreased, if at all, from the range of motion the patient had before the accident is basic and important to establish a baseline against which to measure a patient's progress or lack thereof over time and in response to various forms of treatment.

166.   Basic principles of physical examination for patients complaining of back and/or neck pain after an accident include at least some form of sensory nerve, motor nerve, and reflex testing.  The results of these tests can be important to determine whether neurological pathologies may be a cause of the patient's symptoms.  Furthermore, it is basic and important to document the results of these tests to establish baselines against which to measure a patient's progress or lack

thereof over time and in response to various forms of treatment.   Yet, the documentation from the Vital examinations often omits any reference to any sensory nerve, motor nerve or reflex testing.

167.   Indeed, Zukkoor, Bloda, and other physicians who have worked at Vital often document diagnoses of "cervical radiculopathy" or "lumbar radiculopathy" for patients.   Yet, the documentation for many of these examinations does not report any radicular symptoms, or any sensory nerve, motor nerve or reflex testing which should be a standard part of any physical examination and even more important if the physician is considering a radiculopathy diagnosis.

168.   For example, although Bloda diagnosed Patient G.B. with cervical radiculopathy, his documented exam lacks any reference to symptoms radiating into the patient's upper extremities, which would normally occur if a patient had a cervical radiculopathy.   Nor did he document that he performed any sensory nerve, motor nerve, or reflex testing, which should have been done to determine if the patient was experiencing any muscle weakness or sensory loss in any of the muscles or dermatomes corresponding to any cervical nerve root.   In a February 24, 2015 deposition, when asked how he reached this diagnosis, Bloda was unable to provide an answer.

169.   Furthermore, when considering the possibility that a patient's symptoms may be caused by a radiculopathy, it is basic and important to attempt to

identify which nerve root or nerve roots (which exist on both sides of each vertebral level of the spine) may be injured and a source of the patient's symptoms. Yet, even when documentation of the examinations reflects the kinds of symptoms that may be caused by a radiculopathy, the documentation does not reveal any attempt to correlate the symptoms to a radiculopathy at any particular vertebral level or side of the spine.

170.  Similarly, the documented examinations do not reflect any attempt to (a) assess whether the reported results of MRIs or EDX Tests correlate with the patients' symptoms; (b) determine whether or how the reported results might affect the patients' diagnoses; or (c) impact the patients' treatment plans.

171.  Having failed to legitimately evaluate and diagnose the patients, Zukkoor, Bloda, and other physicians who have worked at Vital also fail to create a legitimate treatment plan to address each patient's unique needs.  Instead, although the patient population at Vital varies widely in terms of age, physical characteristics, medical histories, and types as well as degrees of injuries, the treatment plans typically consist of:  (a) boilerplate prescriptions for physical therapy; (b) global disability determinations to justify transportation and other services; and (c) eventual prescriptions for MRIs, EDX Tests, and pain management consultations, which serve as a pretext for P-STIM Devices.

**a)     The Fraudulent Disability Determinations**

56

172.   Pursuant to the Predetermined Protocol, Zukkoor, Bloda, and other physicians who have worked for Vital routinely find at the initial examinations, as well as through the re-examinations that occur periodically over the course of the patients' treatment, that patients have disabilities that prevent them from driving, working, and various activities of daily living.   *See* Ex. 1.   These disability determinations are not based upon legitimate examinations and diagnoses, nor are they based upon a legitimate determination of any patient's actual abilities or disabilities.

173.   For example, on April 17, 2014, Orlewicz performed an initial examination of patient B.B. and found that she had "full disability."   Over the next eleven months, patient B.B. was re-examined at least seven times at Vital by Orlewicz, Bloda, Zukkoor, and Tarabishy.   At the third through seventh of these examinations, a finding was made again that she continued to be disabled from working.   *See* Ex. 14.   In an August 24, 2015 deposition, however, patient B.B. testified that she has been retired since before the time of her accident.

174.   Rather than providing true reflections of the patients' medical conditions or disabilities, the disability determinations were made to exaggerate the severity of patient's conditions, their need for medical care, diagnostic testing, and transportation service from entities secretly owned and/or controlled by Amanda Bazzi and to inflate the value of their BI and UM Claims.

57

### b)   The Fraudulent EDX Tests

175.   Zukkoor, Bloda, and other physicians who have worked at Vital also frequently refer patients for EDX Tests which are performed by Brennan.   EDX referrals may be appropriate if patients complain of pain radiating into the upper or lower extremities, muscle weakness, sensory loss in the limbs, or abnormal reflexes.   At Vital, EDX referrals are made regardless of whether the patients' documented symptoms indicate a need for EDX Testing.   In fact, as noted above, Zukkoor, Bloda, and other physicians who have worked at Vital either do not provide motor, sensory or reflex testing, or when they do, it is cursory and non-specific, even though these tests are critically important to assess the likelihood of a radiculopathy or other neurological pathologies.

176.   For example, Zukkoor and Bloda referred the majority of the patients at issue who received EDX Testing from Brennan.   Zukkoor routinely does not document any motor, sensory or reflex testing.   Although Bloda refers to motor strength on many of his evaluations, he comments only on upper extremity strength (regardless of patients' presenting complaints), and provides non-specific statements such as "decreased strength in paraspinals," without indicating where the purported decreased strength was located, much less providing any measure of the decreased strength that would then serve as a baseline against which to measure whether the patient is responding to treatment.   In addition, although Bloda

purports to document sensory and reflex testing results for many patients, his purported results are virtually always "normal," a pattern of results that is highly unusual given the number of purported radiculopathy diagnoses provided to these patients.

177.   In addition to making referrals to Brennan for EDX Tests based on inadequate or incomplete information, Zukkoor, Bloda, and other physicians who have worked at Vital also do nothing with the results of the EDX Tests.  At most, they merely paste the results of the EDX Tests verbatim into the reexamination reports without discussing the clinical significance of any results or make any change to their treatment plans.

178.   Moreover, as described below, the patterns of the purported EDX Test results are not credible and, if Zukkoor, Bloda, and other physicians who have worked at Vital were actually reviewing and considering them, they would have known that the results were not credible.

### c)  The MRI Referrals To Affiliated Diagnostic And Insight Diagnostics.

179.   MRIs are advanced imaging procedures that should only be performed if medically necessary based upon the unique circumstances of each patient.  For example, MRIs may be medically necessary when a patient's diagnostic picture is unclear, response to treatment is atypical, or there are legitimate concerns about structural damage or internal injuries to the patient.  When MRIs are ordered, they

should be limited to the targeted body part or area of interest. For patients who complain of back and/or neck pain after an auto accident, are diagnosed with sprains and strains, and receive conservative care, it is uncommon that MRIs are indicated for multiple regions of the spine.

180.   When MRIs are indicated and ordered, the physicians responsible for the patients' treatment should, of course, evaluate the information learned from the MRIs, including whether abnormalities exist, the likely cause of the abnormalities (*e.g.*, genetic, natural degenerative or aging processes, or pathologies such as tumors, trauma) and if the abnormalities may be causing any of the patients' symptoms. The physicians responsible for the patients' treatment should then determine and document whether those findings impact their diagnoses and treatment plans.

181.   By contrast, the MRI referrals generated by Zukkoor, Bloda, and other physicians who have worked at Vital are not made because they are clinically indicated for the patient, but to maximize profits for Amanda Bazzi. Indeed, more than 65% of Vital patients who treated with Vital for more than 30 days received an MRI order from Zukkoor, Bloda, and other physicians who have worked at Vital. In fact, some of these MRIs were ordered on the first Vital date of service, before Zukkoor, Bloda, and other physicians who have worked at Vital even had a chance to assess whether the patients were making progress in conservative care.

182.   Of the Vital patients who had charges submitted to State Farm Mutual and received MRIs after their first date of service with Zukkoor, Bloda, or other physicians who have worked at Vital, more than 90% of them received these MRIs at Defendants Affiliated Diagnostic and/or Insight Diagnostics, and the majority of these patients received MRIs on multiple regions of the spine and/or their extremities.

183.   In addition to routinely ordering MRIs that are not medically indicated for the patient, Zukkoor, Bloda, and other providers who have worked at Vital also do not evaluate the significance of the MRI interpretations and incorporate those findings into diagnoses and future treatment plans.   Indeed, as described above, Zukkoor, Bloda, and other providers who have worked at Vital purport to order MRIs to "rule out pathology that may have aroused[sic] from the motor vehicle accident," including herniations.   But they do not alter the diagnosis or treatment plan regardless of whether herniations are found on the MRIs.   Indeed, they make no attempt to determine whether any of the numerous purported abnormalities mentioned in these interpretive reports had any clinical significance whatsoever for the patients.

184.   The medically unnecessary MRIs conducted by Affiliated Diagnostic and Insight Diagnostics were a highly lucrative component of Defendants' fraud scheme.   In fact, Affiliated Diagnostic and Insight Diagnostics routinely submitted

charges of nearly $5,000 for the MRIs performed on each region of the spine or extremity.

185.   To date, Affiliated Diagnostic and Insight Diagnostics have billed State Farm Mutual nearly $1.5 million, and State Farm Mutual has paid over $250,000, for medically unnecessary MRIs performed on Vital patients.  The chart attached as Exhibit 6 sets forth the fraudulent MRI interpretive reports and bills for patients that Defendants submitted, and caused to be submitted to State Farm Mutual.

### d)   Fraudulent Referrals To Advanced Pain Specialists

186.   The kickback and fee-splitting arrangement between Advanced Pain Specialists and Vital was in place by July 2014.  Thereafter, Zukkoor, Bloda, and other physicians who worked at Vital referred more than 100 State Farm Mutual insureds to Advanced Pain Specialists for pain management consultations, without any regard for whether pain management was appropriate for a particular patient. In fact, these referrals for pain management consultations were made regardless of: (1) whether the patient was purportedly improving in conservative care; (2) the impressions and findings on any MRI reports; and (3) the impressions and findings on any EDX reports.

187.  Moreover, once patients have been referred to Advanced Pain Specialists, Zukkoor, Bloda, and other physicians who worked at Vital routinely

continue to refer the patients to Advanced Pain Specialists at each subsequent re-examination, regardless of the patients' response to treatment, which inevitably serve as a pretext for Advanced Pain Specialists to provide more P-STIM Devices to the patients, even though there is typically no documentation indicating the patients are benefiting from those P-STIM Devices.

188. For example, Patient L.C. began treating at Vital on April 2, 2014, just two days after his automobile accident, and continued treating at Vital for the next 13 months. Although Zukkoor documented that Patient L.C. was improving from physical therapy and/or medication, Zukkoor referred Patient L.C. to Advanced Pain Specialists for pain management on June 25, 2014. At Patient L.C.'s next visit to Vital, Zukkoor again documented that Patient L.C. was improving from physical therapy and/or medication. Nonetheless, Zukkoor recommended that Patient L.C. "[c]ontinue with pain management clinic," even though Patient L.C. had not been seen by Advanced Pain Specialists. When Zukkoor saw patient L.C. on September 22, 2014, Zukkoor also documented that he was improving from physical therapy and/or medication but nonetheless "advised" Patient L.C. to "follow up with the pain management clinics." Based on these referrals, Bitkowski purported to administer six P-STIM Devices on Patient L.C. during a two-month period. When Zukkoor re-examined Patient L.C., his report never even mentioned the patient was being treated by Advanced Pain

Specialists, much less documented any attempt to assess how Patient L.C. had responded to the P-STIM Device. *See* Ex. 15.

### 3. The Fraudulent EDX Tests and Reports.

189. Zukkoor, Bloda, and other physicians who worked for Vital also frequently refer many patients for EDX Tests that are performed by Brennan at Vital.

190. The EDX Tests are unreasonable and unnecessary because: (a) referrals are made regardless of whether the tests are indicated; (b) Brennan performs the same, excessive EDX Tests, which increase the corresponding charges; (c) the EDX Tests are not performed or interpreted properly; and (d) the results of the EDX Tests are not considered or factored into the treatment plans of the physicians who order them.

191. Legitimate EDX Tests, which include nerve conduction velocity tests ("NCVs") and needle electromyography tests ("EMGs") may be indicated for patients who report symptoms that may suggest neurological pathology, such as pain in the neck and/or lower back region that radiates to the arms or legs, abnormal weakness in limbs, significant changes in sensation in limbs, or abnormal reflexes.

192. If NCVs and EMGs are properly performed and interpreted, they can be used to diagnose the existence, nature, extent, and specific location of nerve

pathologies that may be causing the purported symptoms, including peripheral nerve injuries (*i.e.*, injuries to the nerves in the arms and legs) and radiculopathies (pinched or injured nerve roots that run along both sides of the spine at each vertebral level).

### a)      Nerve Conduction Velocity Tests ("NCVs")

193.   NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents.  The velocities, amplitudes, and shapes of the responses are then recorded by electrodes attached to the surface of the skin and are compared with well-defined normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers of the peripheral nerves in the arms and legs.

194.   There are several peripheral nerves in the arms and legs that can be tested with NCVs.  Moreover, many of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.  The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve should be tailored to each patient's unique circumstances.  In a legitimate clinical setting, this decision is based on a history and physical examination of the individual patient, as well as the real-time test results obtained as the NCVs are performed on the sensory and/or motor fibers of each peripheral

nerve.  As a result, the nature and number of the peripheral nerves and the types of nerve fibers tested with NCVs should vary by patient.

**b)      Needle Electromyography Tests ("EMG Tests")**

195.  EMGs involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle.  The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

196.  There are many different muscles and nerves in the arms and legs that can be tested with EMGs.  The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances.  In a legitimate clinical setting, this decision is determined based on a history and physical examination of the individual patient, the presenting symptoms, the real-time results of NCVs that are typically performed in conjunction with EMGs, and the real-time results obtained from the EMGs as they are performed on each specific muscle and the nerves and nerve roots innervating those muscles.  As a result, the number of limbs, as well as the nature and number of muscles tested, should vary by patient.  Moreover, legitimate EMG testing will likely show

significant differences in results across patients because of the inherent variability among patients in both presenting symptoms and in real-time EMG results.

### c)   The AANEM Recommended Policy

197.   The American Association of Neuromuscular & Electrodiagnostic Medicine ("AANEM") was founded in 1953 and is the largest organization worldwide dedicated solely to the scientifically based advancement of neuromuscular medicine.   AANEM membership is comprised of over 5,000 physicians, primarily neurologists and physiatrists.   AANEM's primary goal is to increase the quality of care for patients with neurological disorders through programs in education, research, and quality assurance.   AANEM has issued a Recommended Policy ("Recommended Policy") regarding the optimal use of EDX Tests, including NCV and EMG Tests, to diagnose various forms of nerve abnormalities, including peripheral nerve injuries and radiculopathies.   A copy of the Recommended Policy is attached hereto as Ex. 16.   The AANEM's Recommended Policy has been endorsed by two other premier professional medical organizations:   the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

198.   The Recommended Policy arises out of the recognition that EDX studies "have occasionally been abused by some providers, resulting in overutilization and inappropriate consumption of scarce health resources."  Ex. 16.

67

at 1.  The AANEM's Recommended Policy accurately reflects the demonstrated utility of various forms of EDX studies, including NCVs and EMGs, for diagnosing radiculopathies and other disorders of the central and peripheral nervous systems.

199.  The Recommended Policy correctly recognizes that "EDX studies are individually designed by the EDX consultant for each patient" and that "[t]he examination design is dynamic and often changes during the course of the study in response to new information obtained."  Ex. 16 at 3.  Therefore, the decision of which nerves and muscles, if any, should be tested with NCVs and EMGs should be individually tailored by a physician to address the unique circumstances of each patient based upon a history and examination of the patient, as well as the real-time results as the NCVs and EMGs are performed.

### d)   Brennan's Fraudulent NCV Tests and Bills

### (1)   Fraudulent Testing and Billing Practices

200.  As an initial matter, Brennan does not provide any documentation indicating that he examines patients to determine whether EDX Tests may be indicated, much less to determine *which* types of EDX Tests may be indicated for the patients.  Indeed, Brennan does not even document the patients' presenting symptoms, let alone describe important symptoms such as the existence, distribution pattern, or nature of any radiating pain, or the existence, location, or

68

degree of any muscle weakness, sensory loss, or reflex abnormalities, which are important to identify potential radiculopathies or other neurological pathologies. Instead, Brennan proceeds in a rote manner to perform NCVs in a predetermined, cookie-cutter fashion, regardless of any patient's unique circumstances.

201.   Specifically, Brennan purportedly performed NCVs on the *same* sensory and motor nerves for virtually every patient, regardless of their unique circumstances.  *See* Exs. 2, 4.  In particular, when Brennan purportedly performed upper limb NCVs, he tested the *same* four motor nerves and the same three sensory nerves on virtually every patient.  *See* Ex. 2.  Similarly, when he purportedly performed lower limb NCVs, he tested the *same* four motor nerves and the same three sensory nerves on virtually every patient.  *See* Ex. 4.

202.   The NCVs purportedly performed by Brennan were not performed properly, or were not performed at all, because they contain numerous technical errors, physiologically impossible or highly improbable results, and erroneous interpretations, all of which are simply ignored in Brennan's "impressions."  For instance, many of Brennan's documented NCV results contained markedly reduced motor or sensory responses, or significant asymmetries that, if correct, could indicate serious neurological abnormalities.  Yet, in each instance, Brennan failed to make any note of or in any way consider any of these results.  *See* Ex. 17 for representative examples.

203. In many cases, Brennan's documented NCV results were physiologically impossible, such as reported amplitudes that were higher for proximal stimulation sites (*e.g.*, elbow) than distal stimulation sites (*e.g.*, wrist), but Brennan, again, failed to make any note of or in any way consider any of these physiologically impossible results.

### e)   Brennan's Fraudulent Needle EMG Tests And Bills

204.  Brennan also took a predetermined, cookie-cutter approach to the EMGs he purportedly performed, failing to tailor these tests to the unique circumstances of any patient.

205.  First, Brennan purports to test a grossly excessive number of muscles, well beyond the bounds of legitimate medicine, which suggests that such tests may not actually have been performed.  Specifically, Brennan purports to test typically between 30 to 34 muscles in upper or lower extremity EMGs.  *See* Exs. 2, 4. When he conducts four-limb EMGs, he purports to test an extraordinary 60 to 68 muscles.  *Id*.  If Brennan actually performed EMGs on the number of muscles reflected in his reports, most patients were subjected to dozens of medically unnecessary needle insertions during their EMGs.

206.  In addition to testing a medically unnecessary number of muscles, Brennan typically tested the same muscle groups in the same order on the vast majority of his EMGs, rather than based upon the unique clinical presentations or

real-time NCV and EMG results of the patients.  Strikingly, Brennan purportedly tested the same muscles for each limb irrespective of whether the real-time EMG results showed abnormalities or not.  Thus, patients with absolutely *no* abnormal EMG readings in any muscle at all received essentially the same EMGs as patients with significant abnormalities.

207.   Furthermore, Brennan's documented EMG results reflect a pattern of near-identical abnormalities across many patients that is not credible.  First, for nearly every patient with abnormal results on the EMGs, Brennan purportedly found abnormalities of identical magnitude (1+) in virtually every patient.  *See* Exs. 3, 5.  A 1+ magnitude is the minimum rating that can be assigned to an abnormal reading—anything less than 1+ magnitude is considered normal.  While a magnitude of 1+ is not highly unusual in and of itself, it is extremely unusual that virtually every patient that had an abnormality purportedly had the exact same degree of abnormality—a 1+ magnitude of electrical activity.

208. Second,  when  Brennan  found  abnormalities,  he  found  them exclusively in the form of fibrillations and positive sharp waves.  *See* Exs. 3, 5. Abnormal fibrillations and positive sharp waves typically occur within the first few weeks after a trauma when nerve impulses are interrupted and the muscle fibers begin firing involuntarily. This process is called denervation.  When denervation occurs, other nerve branches will connect and replace the supply of nerve impulses

to the affected muscle over the course of the next few weeks.  This process, innervation, typically produces a variety of other abnormal responses. Accordingly, if the patients evaluated by Brennan truly had abnormal fibrillations and positive sharp wave responses, as reported by Brennan, at least some, if not most, should also have had other abnormal responses.  These patterns of purportedly finding only denervation abnormalities in all patients, with varying symptoms, histories, and time elapsed since their injuries, are not credible.

209.  Third, when Brennan found abnormalities, he purportedly found abnormalities in the same muscle (the triceps) for nearly every patient with an abnormal upper extremity EMG, and also purported to locate the tricep abnormalities on one particular side (the left side) for the vast majority of patients. *See* Ex. 3.  These patterns are not credible across so many patients.

210.  Fourth, for patients with abnormal EMG results in the upper limbs, Brennan diagnosed *all* with cervical radiculopathies at the same spinal nerve root level (C7).  *See* Ex. 3.  Similarly, for nearly every patient with abnormal EMG results in the lower limbs, Brennan diagnosed lumbar radiculopathies at the same spinal nerve root level (L5).  *See* Ex. 5.

211.  The above-described uniformity in Brennan's documented EMG results across such a wide range of patients is not credible, and indicates that Brennan was either not performing the EMGs as reported, or was performing them

72

in a cookie cutter fashion that was not tailored to the circumstances of any patient, and was not properly performing or interpreting the tests.

212.   The charts attached hereto as Exhibits 2-5 summarize the bills and supporting documentation that Vital submitted to State Farm Mutual for EDX Tests that were fraudulent.  To date, Vital has billed approximately $300,000 and State Farm Mutual has paid almost than $50,000 for these EDX Tests.

### 4.    The Fraudulent Treatments by Advanced Pain Specialists

213.   After Zukkoor, Bloda, and other physicians who worked for Vital refer Vital's patients to Advanced Pain Specialists, Borrego, Bitkowski, Orlewicz and other physicians who worked for Advanced Pain Specialists purport to provide pain management consultations that serve as pretexts for the prescription and administration of medically unnecessary P-STIM Devices.

214.   As an initial matter, there are **no** randomized, controlled studies published in the peer-reviewed medical literature demonstrating the efficacy of the P-STIM Device for acute or chronic pain related to the types of soft tissue, neurological, and other conditions that may result from a car accident.  In an April 27, 2016 deposition, Borrego testified that P-STIM Devices provide relief wherever patients experience pain by stimulating the vagus nerve, which leads to the release of endorphins, the increase of blood flow, and "remodulation of the thresholds of perceived pain."  The Eagle Advancement Institute advertised that

the P-STIM Device is supported by randomized, controlled studies and in a September 14, 2015 deposition, Borrego testified that P-STIM Devices are covered by Medicare and Blue Cross.

215.   These representations are false.   Neither Medicare nor Blue Cross cover P-STIM Devices (*see* Ex. 13) and there are **no** such randomized, controlled studies published in the peer-reviewed medical literature.

216.   In fact, Dr. Haladjian, a physician who was initially hired to provide pain management for Vital and is currently listed as a member of the "Orthopedic Team" on Vital's website, testified in a November 9, 2015 deposition that he no longer works at Vital and that he would "never" recommend the P-STIM Device for a patient.   Dr. Haladjian is also a clinical assistant professor at Wayne State University, and further explained that the P-STIM Device is not taught and is not part of the curriculum at Wayne State because there "hasn't been enough evidence to suggest that it is something that should be incorporated in our line of treatment."

217.   Similarly, in an August 8, 2016 deposition, Dr. Ayman Tarabishy, a physician who provided consultations at Vital at the time the P-STIM Devices were administered and was initially listed as a member/manager on the articles of incorporation for Advanced Pain Specialists, has testified that he does not "believe" in the P-STIM Device because he does not "think there's enough medical evidence to support it."

74

218.   Despite its lack of proven efficacy, and the availability of many other clinically proven and well-established alternatives including medications, injections, or surgical procedures (by themselves or in combination) Borrego, Bitkowski, Orlewicz, and other physicians who worked for Advanced Pain Specialists uniformly prescribe P-STIM Devices for Vital's patients.

219.   If the referrals and pain management consultations were intended to assess and address the unique needs of patients, Borrego, Bitkowski, and other physicians who worked for Advanced Pain Specialists should have performed appropriate evaluations of the patients, including consideration of the patients' personal, medical and treatment histories, physical examinations, and medical decision-making to determine what, if any, treatment plan would be most appropriate for each patient. The most appropriate treatment plan might be to take no further action, to prescribe one or more clinically proven medications, injections, surgical procedures, or some combination of these, depending on the unique circumstances of each patient. Importantly, after prescribing a course of treatment, a legitimate pain management physician would then assess whether it is benefiting the patient or not.

220.   By contrast, Borrego, Bitkowski, Orlewicz, and other physicians who have worked for Advanced Pain Specialists do not conduct a legitimate exam or engage in legitimate medical decision-making to reach an individually tailored

course of treatment.  Nor do they consider whether patients are benefiting from the treatment that they have recommended.  Instead, they periodically prescribe and administer the P-STIM Device almost exclusively throughout the duration of the patients' course of care at Vital.  This "decision-making" is supported with a cursory one-page report that contains extremely limited information regarding the patients' conditions or responses to treatments.

221.  In particular, these reports consist of a pre-printed, single-page form that provides only 1-2 lines to explain each element of the exam, including highly important issues like the patient's chief complaint, past medical history, social history, history of present illness, and diagnosis.  Notably, these pre-printed forms have no room to describe, among other issues:  (1) the results of any orthopedic tests; (2) the patient's progress (or lack thereof) in conservative care; or (3) the results of any diagnostic testing, such as EDX Tests and MRIs—all hallmark issues that should be considered in determining whether *any* pain management intervention is necessary, much less a P-STIM Device.

222.  Illustrating the predetermined outcome of these consultations, these pre-printed forms end with a checkbox asking whether the "risks and benefits of the [P-STIM] procedure were discussed and accepted by the patient," presupposing that a procedure (*i.e.* the P-STIM Device) would be recommended.  *See* Ex. 18. Consistent with the predetermination that P-STIM Devices will be provided to

patients, Advanced Pain Specialists uses a charge ticket for billing purposes, which is a pre-printed, single-page form that allows the physicians to check off what was done during the patient's visit, and administering P-STIM Devices is the only procedure that can be checked off on these charge tickets. *See* Ex. 19.

223. Furthermore, while Borrego, Bitkowski, Orlewicz and other physicians who worked for Advanced Pain Specialists routinely diagnose patients with radiculopathy or chronic pain, their documented examinations provide no basis for the diagnosis. First, when they diagnose patients with radiculopathy, these diagnoses do not refer to any specific nerve root. Nor is there any documented attempt to determine whether the patients' pain or sensory loss follows a dermatome or distribution pattern consistent with a radiculopathy at any particular nerve root level.

224. Similarly, although Borrego, Bitkowski, Orlewicz and other physicians who worked for Advanced Pain Specialists routinely diagnose patients with chronic pain, there is no documented attempt to determine if patients' conditions improved through conservative care. To the contrary, many patients are diagnosed with "chronic pain" even though documentation from Vital or other providers indicates that the patients have made progress through conservative care and have a good prognosis.

225.   For example, Patient D.H. was discharged from Vital on August 6, 2014.  According to Bloda, Patient D.H. had been attending physical therapy and, according to the patient, the physical therapy was "going very well."  *See* Ex. 20.  Bloda further explained that Patient D.H. "has had great progression."  *Id*.  Nonetheless, the patient was seen by Orlewicz on the same day, August 6, 2014, and he inexplicably recommended and administered a P-STIM Device purportedly to treat the patient's alleged "chronic lumbar radiculopathy."  *See* Ex. 21.

226.   In fact, in deposition testimony, Bitkowski has conceded that he does not review information from the patients' examinations from Vital, much less the patients' conservative care records, before recommending a P-STIM Device.  Thus, for example, although Bitkowski recommended a P-STIM Device for Patient A.R., Bitkowski made the recommendation without knowing whether Patient A.R. was meeting either his short-or-long term goals in physical therapy.

227.   Rather than providing legitimate pain management services, Borrego, Bitkowski, Orlewicz, and other physicians who worked for Advanced Pain Specialists recommend and administer P-STIM Devices regardless of:  (a) the patient's history; (b) the nature, duration, and quality of the patient's subjective complaints; (c) the examination findings of the referring physicians; (d) diagnostic testing results, such as MRIs and EDX Tests; (e) the extent to which the patient was improving through conservative care; (f) the extent to which the patient may

78

have benefited from prior P-STIM Devices; or (g) clinically proven and well-accepted alternatives to the P-STIM Devices.

228.   Borrego, Bitkowski, Orlewicz and other physicians who worked for Advanced Pain Specialists made these predetermined recommendations for the P-STIM Device even for patients who had significant contraindications. Specifically, Borrego testified that one of the dangers associated with the P-STIM Device is that it increases blood flow and therefore patients must be checked for high blood pressure/hypertension prior to attaching the P-STIM Device. However, approximately one-quarter of Vital patients who received the P-STIM Device had documented indications of hypertension.

229.   For example, Advanced Pain Specialists billed $13,650 for P-STIM Devices provided to Patient K.A., who suffers from hypertension. Patient K.A. testified that the P-STIM Device not only failed to provide any relief, but prevented her from sleeping because it was raising her heart rate. According to Patient K.A., she eventually checked into the emergency room because it raised her "heart rate too high." Patient K.A. further testified that she reported her concerns to her doctors but they only stopped administering the device after she visited the emergency room.

230.   Patient K.A.'s experience of having her response to the P-STIM Device ignored is not an isolated incident. Many of the examinations by Borrego,

Bitkowski, Orlewicz and other physicians who worked for Advanced Pain Specialists fail to document a pain rating or any other measure that could be used to track whether patients are getting any benefit from the P-STIM device. If any pain rating is included, the pain rating is global, even though the vast majority of patients receiving the P-STIM Device report pain in multiple areas of their bodies. Moreover, even if a patient's pain rating is recorded, it is disregarded. Borrego, Bitkowski, Orlewicz and other physicians who worked for Advanced Pain Specialists simply continue to recommend additional P-STIM Devices, regardless of whether the documented pain rating stays the same, increases or decreases.

231. Numerous patients have testified that the P-STIM Device not only failed to relieve their symptoms, but actually caused substantial pain and discomfort. For example, Patient Z.W. testified that she "couldn't stand" the P-STIM Device and that it was "making things worse." Despite her discomfort, Patient Z.W. testified that the physicians at Advanced Pain Specialists told her to "try it again." None of the examinations submitted by Advanced Pain Specialists for Patient Z.W. document her complaints of pain and discomfort.

232. Similarly, Advanced Pain Specialists billed treatment for five P-STIM Devices for Patient N.O. She testified, however, that the P-STIM Devices were painful and did not provide any relief. Patient A.P. also testified that the P-STIM Device provided no relief yet the physicians at Advanced Pain Specialists

continued to recommend more P-STIM Devices.  Although he received a P-STIM Device on five separate occasions, Patient N.P. testified that they never worked. Patient N.P. further testified that he told Orlewicz that the first P-STIM Device did not work, but he nevertheless was administered P-STIM Devices on four subsequent occasions.

233.   Borrego, Bitkowski, Orlewicz and other physicians who worked for Advanced Pain Specialists make no effort to assure that the P-STIM Devices are administered properly by a licensed physician or that patients even keep the P-STIM Device attached once they leave the office.

234.   Specifically, Borrego, Orlewicz, and Bitkowski, have testified that the P-STIM Device *must* be attached to the ear by a licensed physician.  But numerous patients have testified that their P-STIM Devices were not administered by a physician.  In particular, Advanced Pain Specialists does not employ any female physicians but uses female nurses and administrative staff at Vital.  And, although Advanced Pain Specialists submitted charges for administering the P-STIM on Patients G.E., N.O., N.E., C.S., and A.P., these patients have testified that at least some of the P-STIM Devices they received were administered by women.

235.   Similarly, at least one patient has testified that after he told Orlewicz that the P-STIM Device did not work, Orlewicz told him to remove it after leaving the doctor's office.  Specifically, Patient G.E. testified that he told Orlewicz that he

did not want to use the P-STIM Device, and Orlewicz told him that "when you get home if you don't want it just take it off."

236.   Similarly, from May 2014 through at least May 2016, Advanced Pain Specialists has billed State Farm Mutual for medically unnecessary pain management consultations and approximately 300 P-STIM Devices provided to at least 87 patients at the Other Bazzi Related Practices.

237.   The charts attached hereto as Exhibits 7A and 7B set forth the fraudulent consultations and P-STIM Devices for which Advanced Pain Specialists has submitted bills to State Farm Mutual for patients of Vital and the Other Bazzi Related Practices.   To date, Advanced Pain Specialists has billed more than $3 million and State Farm Mutual has paid nearly $500,000 for these consultations and P-STIM Devices.

### F.   State Farm Mutual's Justifiable Reliance

238.   Defendants submitted, and caused to be submitted, medical records and bills falsely representing that Vital's, Advanced Pain Specialists', Affiliated Diagnostics', Insight Diagnostics', and Get Well Transport's services were performed and were medically necessary when, in fact, they were not.

239.   State Farm Mutual is under statutory and contractual duties to promptly pay No-Fault Benefits for medically necessary services.   The bills and supporting documents that Defendants submitted, and caused to be submitted, to

State Farm Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual to justifiably rely on them.

240.    Defendants have made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Mutual.  Each bill and its supporting documentation, when viewed in isolation, do not reveal their fraudulent nature.  Only when the bills and supporting documentation are viewed together as a whole and over time, do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

241.    As a result, State Farm Mutual has incurred damages of more than $750,000 in No-Fault Benefits that it paid to Defendants.

## V.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**COMMON LAW FRAUD**
**(Against All Defendants)**

242.    State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 241 above.

243.    Defendants intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to State Farm Mutual by submitting, and causing to be submitted, thousands of bills and related

documentation for services that were either not performed, or were not performed because they were medically necessary to address the unique needs of patients.

244.   The false statements of material fact include that:

(a) Zukkoor, Bloda, and other physicians who worked for Vital legitimately examined and prescribed physical therapy services for patients that were medically necessary to address the unique needs of each patient, when, in fact, they did not (*see* Ex. 1);

(b) Zukkoor, Bloda, and other physicians who have worked for Vital legitimately examined and determined that patients were disabled from driving and other activities of daily living, when, in fact they did not (*see* Ex. 1);

(c) Get Well Transport provided transportation services because they were medically necessary for the patients, when, in fact, it did not (*see* Ex. 1);

(d) Zukkoor, Bloda, and other physicians who have worked for Vital ordered MRIs because they were medically necessary to address the unique needs of each patient, when, in fact, they were not (*see* Ex. 6);

(e) Zukkoor, Bloda, and other physicians who have worked for Vital ordered EDX Tests for patients because they were medically necessary to address the unique needs of patients, when, in fact, they did not (*see* Exs. 2–5);

(f) Brennan performed EDX Tests because they were medically necessary to address the unique needs of patients, when, in fact, he did not (*see* Exs. 2–5);

(g) Affiliated Diagnostic and Insight Diagnostics provided medically necessary MRIs, when, in fact, they did not (*see* Ex. 6);

(h) Zukkoor, Bloda, and other physicians who have worked for Vital ordered pain management consultations from Advanced Pain Specialists for patients because they were medically necessary to address the unique needs of patients, when, in fact, they were not (*see* Ex. 7); and

(i)    Borrego, Bitkowski, and other physicians who worked for Advanced Pain Specialists legitimately examined and prescribed P-STIM Devices for patients at Vital and the Other Bazzi Related Practices that were medically necessary to address the unique needs of each patient, when, in fact, they did not (*see* Exs. 7A and 7B).

Representative examples of the fraudulent reports, documentation, and bills can be found in Exhibits 14, 15, and 17–21.

245.   Defendants knew that the above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

246.   Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual to rely on the misrepresentations.

247.   As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $750,000 in No-Fault Benefits paid to Defendants.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just and proper.

## SECOND CAUSE OF ACTION
## UNJUST ENRICHMENT
## (Against All Defendants)

248.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 241 above.

249.   State Farm Mutual conferred a benefit upon Defendants by paying their claims and Defendants voluntarily accepted and retained the benefit of those payments.

250.   Because Defendants knowingly submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation for services that were not performed or were not performed because they were medically necessary and, with respect to the services allegedly performed by Advanced Pain Specialists on Vital's patients, were provided pursuant to unlawful kickback and fee-splitting arrangements between Borrego and Amanda Bazzi, circumstances are such that it would be unjust and inequitable to allow them to retain the benefit of the monies paid.

251.   As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Defendants have been unjustly enriched by more than $750,000.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

## THIRD CAUSE OF ACTION
## VIOLATION OF 18 U.S.C. § 1962(c)
## (Against All Defendants)

252.   State Farm Mutual incorporates, adopts, and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 241 above.

253.   All defendants formed an association-in-fact "enterprise" (the "Bazzi-Borrego Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce.

254.   The members of the Bazzi-Borrego Fraudulent Billing Enterprise were  joined in a common purpose, had relationships with and among each other, and associated through time sufficient to permit those associated to pursue the enterprise's common purpose, which was to defraud State Farm Mutual and other insurers through fraudulent claims for No-Fault Benefits.

255.   Each defendant needed and depended upon the participation of the other defendants to accomplish their common purpose of defrauding State Farm Mutual and other insurers through fraudulent claims for No-Fault Benefits. Specifically,

(a) Vital was necessary to continue the fraud scheme that Amanda Bazzi, Zukkoor, Bloda, Brennan, and others had been carrying on through Medical Evaluations until Allstate's Medical Evaluations Lawsuit was filed;

87

(b) Zukkoor served as the nominee owner of Vital to conceal Amanda Bazzi's true ownership and control of Vital;

(c) Zukkoor and Bloda falsely purported to perform legitimate examinations and to prescribe transportation, physical therapy, EDX Tests and MRIs allegedly because they were medically necessary, when, in fact, their examinations were not legitimate and these services were prescribed to enrich Amanda Bazzi through her secret ownership and control of Vital, Affiliated Diagnostic, and Insight Diagnostics, as well as her relationship with Get Well Transport;

(d) Zukkoor and Bloda falsely purported to perform legitimate examinations and to prescribe pain management consultations from Advanced Pain Specialists because they were medically necessary, when, in fact, their examinations were not legitimate and these services were prescribed to enrich Amanda Bazzi and Borrego through their unlawful kickback and fee-splitting arrangement;

(e) Borrego and Bitkowski falsely purported to perform legitimate consultations on patients at Vital and the Other Bazzi Related Practices and prescribe P-STIM Devices allegedly because they were medically necessary, when, in fact, their consultations were not legitimate, and both the consultations and P-STIM Devices were provided to enrich Amanda Bazzi and Borrego pursuant to their unlawful kickback and fee-splitting arrangement;

(f) Ringold served as the nominee owner along with Nesreen Bazzi of Affiliated Diagnostic and Insight Diagnostics to facilitate the scheme by concealing Amanda Bazzi's true ownership and control of those entities and enable her to profit from medically unnecessary MRIs;

(g) Mike Makki has enabled Amanda Bazzi to maintain her secret ownership and control of Affiliated Diagnostic and Insight Diagnostics by managing their day-to-day operations and referral relationship with Vital;

(h) Hala Makki has managed Get Well Transport to facilitate and maximize the profitability of Amanda Bazzi's fraudulent network of medical practices, providing substantial transportation services to patients at medical clinics owned and/or controlled by Amanda Bazzi, including Vital; and

(i) Vital, Advanced Pain Specialists, Affiliated Diagnostic, Insight Diagnostics, and Get Well Transport served as the entities through which the Defendants purportedly performed the above-described services and submitted, and caused to be submitted, to State Farm Mutual the bills and supporting documentation for these services.

256. The participation and roles of each Defendant were necessary to the success of the scheme. None of these Defendants were capable of carrying out the scheme without the participation of the others.

257. Each Defendant has been employed by and/or associated with the Bazzi-Borrego Fraudulent Billing Enterprise.

258. Each Defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Bazzi-Borrego Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit to State Farm Mutual and other insurers hundreds of fraudulent claims for services that were medically unnecessary or were not performed, which are described in the RICO Events on Exhibit 1 attached hereto. The false statements of material fact include that:

(a) Zukkoor, Bloda, and other physicians who worked for Vital legitimately examined and prescribed physical therapy services for patients that were medically necessary to address the unique needs of each patient, when, in fact, they did not (see Ex. 1);

(b) Zukkoor, Bloda, and other physicians who have worked for Vital legitimately examined and determined that patients were disabled

from driving and other activities of daily living, when, in fact they did not (*see* Ex. 1);

(c) Get Well Transport provided transportation services because they were medically necessary for the patients, when, in fact, it did not (*see* Ex. 1);

(d) Zukkoor, Bloda, and other physicians who have worked for Vital ordered MRIs because they were medically necessary to address the unique needs of each patient, when, in fact, they were not (*see* Ex. 6);

(e) Zukkoor, Bloda, and other physicians who have worked for Vital ordered EDX Tests for patients because they were medically necessary to address the unique needs of patients, when, in fact, they did not (*see* Exs. 2–5);

(f) Brennan performed EDX Tests because they were medically necessary to address the unique needs of patients, when, in fact, he did not (*see* Exs. 2–5);

(g) Affiliated Diagnostic and Insight Diagnostics provided medically necessary MRIs, when, in fact, they did not (*see* Ex. 6);

(h) Zukkoor, Bloda, and other physicians who have worked for Vital ordered pain management consultations from Advanced Pain Specialists for patients because they were medically necessary to address the unique needs of patients, when, in fact, they were not (*see* Ex. 7); and

(i) Borrego, Bitkowski, Orlewicz, and other physicians who worked for Advanced Pain Specialists legitimately examined and prescribed P-STIM Devices for patients at Vital and the Other Bazzi Related Practices that were medically necessary to address the unique needs of each patient, when, in fact, they did not (*see* Exs. 7A and 7B).

Representative examples of the fraudulent reports, documentation, and bills can be found in Exhibits 14, 15, and 17–21.

259.   By reason of the above-described conduct, State Farm Mutual has been injured in its business and property in that it has paid more than $750,000 to Defendants based upon the fraudulent charges.

WHEREFORE, State Farm Mutual demands judgment against Defendants, compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION:
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Against All Defendants)

260.   State Farm Mutual incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 241 above.

261.   Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Bazzi-Borrego Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual and other insurers hundreds of fraudulent claims for services which were medically unnecessary or were not performed.

262.   The charts attached hereto as Exhibit 1–7B summarize bills that Defendants submitted, and caused to be submitted, to State Farm Mutual in furtherance of their mail fraud scheme.

263.   Defendants agreed to and acted in furtherance of the common and overall objective of the conspiracy, to defraud State Farm Mutual and other insurers, through the roles and conduct described in paragraphs 253 through 258 above.

264.   By reason of the above-described conduct, State Farm Mutual has been injured in its business and property in that it has paid more than $750,000 to Defendants based upon the fraudulent charges.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
### DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
### (Against Vital, Advanced Pain Specialists, Affiliated Diagnostic, Insight Diagnostics, and Get Well Transport)

265.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 241 above.

266.   This action is for declaratory relief pursuant to 28 U.S.C. § 2201.

267.   There is an actual case and controversy between State Farm Mutual, on one hand, and Vital, on the other hand, as to all charges for patients who received examinations and EDX Tests purportedly performed at Vital that have not been paid.  State Farm Mutual contends that Vital is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

268.   There is an actual case and controversy between State Farm Mutual, on one hand, and Advanced Pain Specialists, on the other hand, as to all charges for pain management consultations and P-STIM Devices that have not been paid. State Farm Mutual contends that Advanced Pain Specialists is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm to date and through the trial of this case.

269.   There is an actual case and controversy between State Farm Mutual, on one hand, and Affiliated Diagnostic and Insight Diagnostics, on the other hand, as to all charges for MRIs ordered by Zukkoor, Bloda, and other physicians who have worked at Vital and performed at Affiliated Diagnostic and Insight Diagnostics that have not been paid.  State Farm Mutual contends that Affiliated Diagnostic and Insight Diagnostics are not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

270.   There is an actual case and controversy between State Farm Mutual, on one hand, and Get Well Transport, on the other hand, as to all charges for transportation for patients with disability findings made by Zukkoor, Bloda, as well as other physicians who worked for Vital, that have not been paid.  State Farm Mutual contends that Get Well Transport is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

271.  Because Vital, Advanced Pain Specialists, Affiliated Diagnostic, Insight Diagnostics, and Get Well Transport have knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that each of them has submitted to State Farm Mutual, they are not entitled to any reimbursement for any unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

WHEREFORE, State Farm Mutual respectfully requests a judgment declaring that:

(a) Vital is not entitled to reimbursement for any of the unpaid claims and charges for examinations and EDX Tests performed at Vital submitted to State Farm Mutual to date and through the trial of this case;

(b) Advanced Pain Specialists is not entitled to reimbursement for any unpaid claims and charges submitted to State Farm Mutual to date and

through the trial of this case for pain management consultations and P-STIM Devices;

(c) Affiliated Diagnostic and Insight Diagnostics are not entitled to reimbursement for any unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case for MRIs for patients referred by Zukkoor, Bloda, Orlewicz, as well as other physicians who worked for Vital purportedly performed at those facilities; and

(d) Get Well Transport is not entitled to reimbursement for any unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case for transportation for patients with disability findings made by Zukkoor, Bloda, as well as other physicians who worked for Vital.

State Farm Mutual also respectfully seeks supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual demands a trial by jury.

Dated:  June 1, 2017

By   s/ Eric T. Gortner
One of the Attorneys for State Farm Mutual Automobile Insurance Company

Ross O. Silverman (IL 6226560)
Eric T. Gortner (IL 6275017)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661-3693
312.902.5200
ross.silverman@kattenlaw.com

eric.gortner@kattenlaw.com

Thomas Cranmer
Miller Canfield
840 W. Long Lake Road
Suite 200
Troy, MI  48098
248.267.3381
cranmer@millercanfield.com

Attorneys for Plaintiff State Farm
Mutual Automobile Insurance Company